OLIVER et al., Appellees,

v.

FELDNER, Appellant.

[Cite as *Oliver v. Feldner,* 149 Ohio App.3d 114, 2002-Ohio-3209.]

Court of Appeals of Ohio,
Seventh District, Noble County.

No. CA–290.

Decided June 21, 2002.

Hoffman Law Office and Grace L. Hoffman, for appellees.

Tribbie, Scott, Plummer & Padden and Daniel G. Padden, for appellant.

---

WAITE, Judge.

{¶ 1} This timely appeal arises from a decision of the Noble County Court of Common Pleas granting visitation rights to appellees, the grandparents of Laken A. Feldner ("Laken"). Theresa A. Feldner ("appellant") argues that the trial court did not give special weight to her wishes that her daughter Laken have no visitation with appellees, as required by *Troxel v. Granville* (2000), 530 U.S. 57,

120 S.Ct. 2054, 147 L.Ed.2d 49. For the following reasons, the judgment of the trial court is reversed and judgment is entered in favor of appellant.

{¶ 2} This is the second time this case has been before this court. See *Oliver v. Feldner* (Jan. 25, 2001), 7th Dist. No. 271, 2001 WL 111769 (*"Oliver I"*). The prior appeal arose out of a paternity action and a visitation petition. The paternity action was initiated by John T. Oliver. Appellant married John T. Oliver in 1992, but they divorced shortly thereafter. Afterward, the two maintained a relationship, although they never remarried. On May 6, 1998, appellant gave birth to Laken. It was presumed that John T. Oliver was the father. Appellees are the parents of John T. Oliver and the paternal grandparents of Laken. Appellant allowed John T. Oliver to visit and assist in raising Laken until August 1998. Appellant visited appellees' home with Laken approximately 4–5 times during those months.

{¶ 3} On September 16, 1998, John T. Oliver requested that the Noble County Child Support Enforcement Agency ("CSEA") determine the paternity of Laken. Appellant and Laken submitted themselves for genetic testing. John T. Oliver was killed in an automobile accident on October 17, 1998, prior to his submission for genetic testing.

{¶ 4} Appellees, along with the decedent's brother, Kenneth Oliver, sent a notarized statement to CSEA requesting that genetic testing be completed. The county coroner took a blood sample from the decedent, which was later used to establish that he was the father of Laken.

{¶ 5} On December 3, 1998, appellees filed a complaint in the Noble County Court of Common Pleas against appellant seeking visitation as paternal grandparents of Laken. After a full hearing, the trial court ruled on July 29, 1999, that it would be in Laken's best interests to have visitation with appellees. Appellant appealed this ruling, which resulted in the *Oliver I* decision.

{¶ 6} In *Oliver I*, this court reversed and remanded the visitation decision on two grounds: (1) the trial court did not "articulate specific findings to support its determination that visitation would be in the best interests of the minor child," nor did it indicate which of the best-interests factors found in R.C. 3109.051(D) influenced the court's decision; and (2) the trial court did not "afford due deference to appellant's decision with regards to the issue of visitation," as required by *Troxel,* supra. *Oliver I* at * 6. On January 25, 2001, as a result of this court's Oliver I decision, the case was remanded to the trial court for further proceedings on the visitation issue.

{¶ 7} On May 4, 2001, the trial court, without holding any additional hearings, again ruled that it was in Laken's best interests to have visitation with appellees. The journal entry does not mention this court's *Oliver I* decision. The trial court

noted that it should "give special weight to the decision of a parent," but ultimately rejected appellant's reasons for denying visitation.

{¶ 8} The trial court proceeded to award appellees slightly more visitation rights than they were granted in its original decision. The original decision provided for four hours of visitation per month at either the home of appellees or appellant and allowed appellant to provide transportation and be present during visitation. (July 29, 1999 Journal Entry.) The subsequent decision allowed 4–5 hours of visitation only in appellees' home and placed no restrictions on what persons may be present during visitation. (May 4, 2001 Journal Entry.)

{¶ 9} Appellant filed this timely appeal on June 4, 2001. Although the appeal appears to have been filed thirty-one days after the trial court's judgment, the thirtieth day was a Sunday. Pursuant to App.R. 14(A), the appeal is deemed timely filed.

{¶ 10} Appellant presents three closely related assignments of error, which will be treated together for ease in analysis:

{¶ 11} "The trial court erred and abused its discretion when it failed to fully and adequately review the factors set forth in Ohio Revised Code Section 3109.051(D).

{¶ 12} "The trial court erred and abused its discretion by failing to afford the defendant-appellant's parental decision material or special weight.

{¶ 13} "The trial court erred and abused its discretion under the Fourteenth Amendment's Due Process Clause by granting grandparent visitation rights."

{¶ 14} Appellant cites only one case in her brief: the *Troxel* case.

{¶ 15} Appellant argues that the trial court once again failed to sufficiently consider the best-interests factors set forth in R.C. 3109.051(D). Appellant particularly points to Laken's asthma, which appellant believes is aggravated by visitation in appellees' home.

{¶ 16} Appellant also points to evidence that appellees blame appellant for their son's death. Appellant does not specify which factor in R.C. 3109.051(D) is implicated by the alleged animosity.

{¶ 17} Appellant further argues that the trial court did not give any special weight to her wishes as required both by *Troxel* and *Oliver I*. Appellant quotes extensively from *Troxel* in an attempt to define the meaning of "special weight":

{¶ 18} "[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Id., 530 U.S. 66, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 19} "Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." Id. at 68–69, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 20} "The decisional framework employed by the Superior Court directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child." Id. at 69, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 21} "In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance." Id. at 70, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 22} "[T]he visitation order in this case was an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody, and control of her two daughters." Id. at 72, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 23} "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." Id. at 72–73, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 24} Appellant argues that, according to Troxel, the weight to be afforded her desire to prevent her daughter from visiting with appellees should be significant and substantial and that the trial court's mere differing opinion should not overcome her fundamental right to raise her child according to her own decisions as to the child's best interests.

{¶ 25} Appellees argue that the trial court, on remand, reviewed the relevant factors in R.C. 3109.051(D) and stated them in his opinion. Appellees also argue that the arguments appellant raises concerning Laken's asthma and the enmity between the parties were raised prior to the trial court's original judgment and should not be reconsidered in this second appeal.

{¶ 26} Appellees attempt to distinguish Troxel from the case at bar. Appellees argue that Troxel involved an unusually broad statute in which any person could seek visitation rights at any time. Appellees argue that Ohio's visitation statutes apply only after certain disruptive events have occurred, such as divorce or the death of one of the parents, or if the child's mother is unmarried. See R.C. 3109.051, 3109.11, 3109.12.

{¶ 27} Appellees also indicate that the trial court specifically stated that it took appellant's wishes into consideration. Appellees argue that the require-

ments of *Troxel* were satisfied and that the overall decision of the trial court should be reviewed only for abuse of discretion, citing *Booth v. Booth* (1989), 44 Ohio St.3d 142, 144, 541 N.E.2d 1028, in support. Based on the history of this matter and the record herein, appellees are unpersuasive. Appellant's argument has merit and the decision of the trial court is hereby reversed.

{¶ 28} Very few Ohio cases have yet dealt with the implications of the *Troxel* decision on Ohio's visitation statutes. See *Oliver I; Epps v. Epps* (Aug. 9, 2001), 5th Dist. No. 01COA01403, 2001 WL 914132; *In re Woodall* (June 13, 2001), 9th Dist. Nos. C.A. 20346 and C.A. 20436, 2001 WL 651540. The *Epps* and *Woodall* cases give only a brief analysis of *Troxel.* This court, in *Oliver I,* basically deferred the questions raised by *Troxel* by remanding the matter so that the trial court could make its findings more specific.

{¶ 29} The nonparental-visitation statutes which are relevant to the case sub judice are found in R.C. 3109.11 and 3109.12. R.C. 3109.11 states:

{¶ 30} "If either the father or mother of an unmarried minor child is deceased, the court of common pleas of the county in which the minor child resides may grant the parents and other relatives of the deceased father or mother reasonable companionship or visitation rights with respect to the minor child during the child's minority if the parent or other relative files a complaint requesting reasonable companionship or visitation rights and if the court determines that the granting of the companionship or visitation rights is in the best interest of the minor child. In determining whether to grant any person reasonable companionship or visitation rights with respect to any child, the court shall consider all relevant factors, including, but not limited to, the factors set forth in division (D) of section 3109.051 of the Revised Code. Divisions (C), (K), and (L) of section 3109.051 of the Revised Code apply to the determination of reasonable companionship or visitation rights under this section and to any order granting any such rights that is issued under this section.

{¶ 31} "The remarriage of the surviving parent of the child or the adoption of the child by the spouse of the surviving parent of the child does not affect the authority of the court under this section to grant reasonable companionship or visitation rights with respect to the child to a parent or other relative of the child's deceased father or mother."

{¶ 32} R.C. 3109.12 states:

{¶ 33} "(A) If a child is born to an unmarried woman, the parents of the woman and any relative of the woman may file a complaint requesting the court of common pleas of the county in which the child resides to grant them reasonable companionship or visitation rights with the child. If a child is born to an unmarried woman and if the father of the child has acknowledged the child

and that acknowledgment has become final pursuant to section 2151.232, 3111.25, or 3111.821 of the Revised Code or has been determined in an action under Chapter 3111. of the Revised Code to be the father of the child, the father may file a complaint requesting that the court of appropriate jurisdiction of the county in which the child resides grant him reasonable parenting time rights with the child and the parents of the father and any relative of the father may file a complaint requesting that the court grant them reasonable companionship or visitation rights with the child.

{¶ 34}  "(B) The court may grant the parenting time rights or companionship or visitation rights requested under division (A) of this section, if it determines that the granting of the parenting time rights or companionship or visitation rights is in the best interest of the child.  In determining whether to grant reasonable parenting time rights or reasonable companionship or visitation rights with respect to any child, the court shall consider all relevant factors, including, but not limited to, the factors set forth in division (D) of section 3109.051 of the Revised Code. Divisions (C), (K), and (L) of section 3109.051 of the Revised Code apply to the determination of reasonable parenting time rights or reasonable companionship or visitation rights under this section and to any order granting any such rights that is issued under this section.

{¶ 35}  "The marriage or remarriage of the mother or father of a child does not affect the authority of the court under this section to grant the natural father reasonable parenting time rights or the parents or relatives of the natural father or the parents or relatives of the mother of the child reasonable companionship or visitation rights with respect to the child."

{¶ 36}  Because Laken's father was deceased, and because appellant was unmarried when she gave birth to Laken and John T. Oliver was judicially acknowledged to be the father, appellees could request visitation with Laken under either statute.  The trial court's standard of review for granting visitation, which is the same under both statutes, is the "best interest" standard, guided by the best-interest factors found in R.C. 3109.051(D).

{¶ 37}  Our analysis begins with the recognition that statutes carry a strong presumption of constitutionality and that the party challenging the constitutionality of a statute bears the burden of overcoming this presumption. *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas* (1967), 9 Ohio St.2d 159, 161, 38 O.O.2d 404, 224 N.E.2d 906.  Only if it appears beyond a reasonable doubt that the constitutional provision and the statute are clearly incompatible will the legislation be held as unconstitutional. *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 147, 57 O.O. 134, 128 N.E.2d 59.  Although legislative enactments are afforded a high degree of deference, reviewing courts have the duty to interpret statutes and declare them constitutionally inoperative if neces-

sary. *Cincinnati City School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 383, 12 O.O.3d 327, 390 N.E.2d 813.

{¶ 38} A party may challenge a statute as unconstitutional either on its face or as applied to a particular set of facts. *Belden v. Union Cent. Life Ins. Co.* (1944), 143 Ohio St. 329, 28 O.O. 295, 55 N.E.2d 629, paragraph four of the syllabus. The effect of a successful challenge will differ depending on whether the court strikes the statute on its face or as applied. "If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional, but if a statute is unconstitutional on its face, the State may not enforce the statute under any circumstances." *Women's Med. Professional Corp. v. Voinovich* (C.A.6, 1997), 130 F.3d 187, 193.

{¶ 39} A statute may be unconstitutional as applied to a class of persons, or it may be unconstitutional as applied to an individual person. See, e.g., *Washington v. Glucksberg* (1997), 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772, fn. 4.

{¶ 40} A court generally applies the rational-basis test in examining the constitutionality of a statute under substantive due process. *Adkins v. McFaul* (1996), 76 Ohio St.3d 350, 351, 667 N.E.2d 1171. To satisfy this test, a statute need only bear a rational relationship to a legitimate state purpose, and must not be arbitrary, discriminatory, capricious, or unreasonable. *State v. Thompkins* (1996), 75 Ohio St.3d 558, 561, 664 N.E.2d 926. If, however, challenged legislation impinges upon a fundamental constitutional right, courts must examine the statute under the strict-scrutiny standard. *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 423, 633 N.E.2d 504; *Clark v. Jeter* (1988), 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465. Under the strict-scrutiny standard, a statute unconstitutionally infringes upon a fundamental right unless the statute is necessary to promote a compelling governmental interest and is narrowly tailored to achieve that interest. See *Perry Edn. Assn. v. Perry Local Educators' Assn.* (1983), 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794; *Primes v. Tyler* (1975), 43 Ohio St.2d 195, 198–199, 72 O.O.2d 112, 331 N.E.2d 723; *Sorrell*, supra, at 423, 633 N.E.2d 504. The United States Supreme Court has acknowledged that a law rarely survives such scrutiny. *Burson v. Freeman* (1992), 504 U.S. 191, 200, 112 S.Ct. 1846, 119 L.Ed.2d 5.

{¶ 41} If Ohio's nonparental-visitation statutes impinge upon a fundamental constitutional right, they must be reviewed under the strict-scrutiny test. Therefore, it must first be determined whether a fundamental right is at stake.

{¶ 42} The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The Due Process Clause "includes a substantive component that 'provides heightened protection against government interference

with certain fundamental rights and liberty interests.'" *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054, 147 L.Ed.2d 49, quoting *Washington v. Glucksberg,* supra, 521 U.S. at 720, 117 S.Ct. 2258, 138 L.Ed.2d 772.

{¶ 43}   As the United States Supreme Court stated in *Troxel,* the "liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel,* 530 U.S. at 65, 120 S.Ct. 2054, 147 L.Ed.2d 49.   The Ohio Supreme Court has echoed this conclusion.   *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 372, 696 N.E.2d 201; *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 10, 15 O.O.3d 3, 399 N.E.2d 66.

{¶ 44}   In *Meyer v. Nebraska* (1923), 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, the Supreme Court held as unconstitutional a statute that prohibited the teaching of certain foreign languages at an elementary school.   The court reasoned that the Due Process Clause protects the rights of parents to "establish a home and bring up children" and "to control the education of their own."   Id. at 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042.

{¶ 45}   Two years later, in *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, the court held as unconstitutional a statute that required parents to send their children to public schools, reasoning that the statute interfered with the liberty rights of parents "to direct the upbringing and education of children under their control."   The *Pierce* court explained that a "child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."   Id. at 535, 45 S.Ct. 571, 69 L.Ed. 1070.

{¶ 46}   In *Stanley v. Illinois* (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, the court held as unconstitutional a statute that attempted to force the children of unwed fathers to become wards of the state after the death of the mother.   The court reasoned: "The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection."   Id. at 651, 92 S.Ct. 1208, 31 L.Ed.2d 551.

{¶ 47}   In *Wisconsin v. Yoder* (1972), 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, the court held, both on grounds of fundamental rights and on the basis of the First Amendment right to free exercise of religion, that a state's compulsory-education law did not apply to a group of Amish children.   The court held: "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children.   This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."   Id. at 232, 92 S.Ct. 1526, 32 L.Ed.2d 15.

{¶ 48} In *Santosky v. Kramer* (1982), 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599, the court reiterated that, even during proceedings to determine whether parental rights should be terminated, "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." Id. at 753, 102 S.Ct. 1388, 71 L.Ed.2d 599.

{¶ 49} In *Troxel,* the court was called upon to review the constitutionality of the state of Washington's version of a nonparental-visitation statute. The Washington statute was broader than Ohio's, in that it allowed any person to petition the court at any time to grant visitation, with the only requirement being that the visitation serve the best interests of the child. 530 U.S. at 67, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 50} The factual context of *Troxel* is very similar to that of the case at bar. In *Troxel,* Tommie Granville and Brad Troxel had two daughters together. Tommie and Brad never married, and they ended their relationship in 1991. In 1993 Brad committed suicide. His parents, i.e., the paternal grandparents, petitioned to maintain visitation rights with their grandchildren after their son's death. The mother did not oppose visitation altogether but disapproved of the amount of visitation requested by the grandparents. The parties agreed that the mother was fit to raise her children and to make childrearing decisions.

{¶ 51} The Washington Supreme Court denied the grandparents' visitation petition and declared the visitation statute to be unconstitutional on two grounds: (1) for the state to interfere with the parents' right to raise their children, the United States Constitution requires a showing of harm or potential harm to the children, and this factor was left out of the visitation statute; and (2) the statute was too broad, because it allowed anyone at anytime to ask a trial court to trump the decisions of parents concerning visitation without any deference to the wishes of the parents. *In re Smith* (1998), 137 Wash.2d 1, 15–20, 969 P.2d 21.

{¶ 52} The United States Supreme Court agreed that the Washington statute was unconstitutional, albeit for different reasons than those of the Washington Supreme Court. In *Troxel,* Justice O'Connor, writing for a plurality of the court (including Chief Justice Rehnquist, along with Justices Ginsburg and Breyer), found that the Washington statute was unconstitutional as applied because of its "sweeping breadth." *Troxel,* 530 U.S. at 73, 120 S.Ct. 2054, 147 L.Ed.2d 49. The *Troxel* opinion also makes it clear that the Washington statute was unconstitutional under any level of judicial scrutiny. Id. at 80, 120 S.Ct. 2054, 147 L.Ed.2d 49 (Thomas, J., concurring).

{¶ 53} The plurality further held that the case should be dismissed rather than remanded for additional proceedings. Id. at 75, 120 S.Ct. 2054, 147 L.Ed.2d 49. The court reasoned that "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the

constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.' " Id., quoting dissent of Kennedy, J., at 101, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 54} The plurality, as well as Justices Thomas and Stevens, expressly recognized that parents have a fundamental right to the care and custody of their children. *Troxel*, 530 U.S. at 65, 80, 120 S.Ct. 2054, 147 L.Ed.2d 49 (Thomas, J., concurring), 86–87 (Stevens, J., dissenting). Justices Souter and Kennedy also acknowledged that parents have a due process right in the companionship, care, and upbringing of their children. Id. at 77, 120 S.Ct. 2054, 147 L.Ed.2d 49 (Souter, J., concurring), 95 (Kennedy, J., dissenting). It is difficult to escape the conclusion, with eight of nine Supreme Court Justices agreeing that a fundamental due process right was at stake in *Troxel*, that a strict-scrutiny analysis must be undertaken in reviewing nonparental-visitation statutes.

{¶ 55} In light of extensive Supreme Court precedent *Troxel* concluded that "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel* at 66, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 56} *Troxel* also held that, "if a fit parent's decision of the kind at issue here becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." Id., 530 U.S. at 70, 120 S.Ct. 2054, 147 L.Ed.2d 49. This holding recognizes that there are at least two hurdles of constitutional analysis which must be overcome for a nonparental visitation order to be valid. The first hurdle, and that which takes up the major part of the *Troxel* decision, addresses whether there are compelling and narrowly tailored reasons for a court to be hearing the visitation case at all. The second hurdle addresses whether there are compelling and narrowly tailored reasons for the court to impose a specific visitation order on the parents. Assuming that the statute has overcome the first hurdle (i.e., there is a constitutionally valid reason for haling the parents into court), the *Troxel* court articulated the "special weight" rule to ensure that any resulting visitation order would also be narrowly tailored to serve a compelling governmental interest.

{¶ 57} All three of appellant's assignments of error involve the second hurdle mentioned above. Appellant does not argue that it was unconstitutional for her to be brought into court on a visitation order at all. She argues that the actual order is an unconstitutional infringement of her fundamental right to raise her daughter as she sees fit.

{¶ 58} *Troxel* did not provide much guidance on how to evaluate a specific visitation order. Furthermore, *Troxel* did not define the "special weight" which

the trial court must give to the parents' wishes. *Troxel* noted that there was a "traditional presumption that a fit parent will act in the best interest of his or her child." Id., 530 U.S. at 69, 120 S.Ct. 2054, 147 L.Ed.2d 49. It is clear from *Troxel* that a strict-scrutiny analysis must be applied to both the nonparental-visitation statute and to the method in which the statute is applied, but the court cautioned that "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best 'elaborated with care.' " Id. at 73, 120 S.Ct. 2054, 147 L.Ed.2d 49, quoting dissent of Kennedy, J.

■ {¶ 59} The "special weight" requirement gives the trial court an opportunity to determine that a compelling governmental interest is at stake. Even though the *Troxel* court did not define "special weight," previous Supreme Court decisions make it clear that "special weight" is a very strong term signifying extreme deference. See, e.g., *Rodrigues v. Hawaii* (1984), 469 U.S. 1078, 1080, 105 S.Ct. 580, 83 L.Ed.2d 691 (special weight is given to a verdict of acquittal, signifying a conclusive presumption that a second trial would be unfair); *Guardians Assn. v. Civ. Serv. Comm.* (1983), 463 U.S. 582, 621, 103 S.Ct. 3221, 77 L.Ed.2d 866 (special weight given to longstanding and consistent administrative interpretations of a statute; court must defer to the interpretation even if the court would interpret the statute differently); *Comstock v. Group of Institutional Investors* (1948), 335 U.S. 211, 230, 68 S.Ct. 1454, 92 L.Ed. 1911 (findings of bankruptcy judge are given special weight; reviewing courts should defer to those findings). The "special weight" requirement, as illuminated by these prior Supreme Court cases, means that the deference provided to the parent's wishes will be overcome only by some compelling governmental interest and overwhelmingly clear circumstances supporting that governmental interest.

{¶ 60} Traditionally, the compelling governmental interest in interfering with a parent's care and custody of children has been the protection of the children from harm. "The state's compelling interest in protecting children from physical or mental harm clearly allows a court to deny custody to a parent who will not provide for the physical and mental needs of the child." *Pater v. Pater* (1992), 63 Ohio St.3d 393, 398, 588 N.E.2d 794. "Although the termination of the rights of a natural parent should be an alternative of 'last resort,' such an extreme disposition is nevertheless expressly sanctioned * * * when it is necessary for the 'welfare' of the child." *In re Cunningham* (1979), 59 Ohio St.2d 100, 105, 13 O.O.3d 78, 391 N.E.2d 1034. "The state's authority over children's activities must, as we have already noted, be broader than it is over like activities of adults if those of tender years are to be protected against some clear and present danger." *In re Willmann* (1986), 24 Ohio App.3d 191, 199, 24 OBR 313, 493 N.E.2d 1380.

■ {¶ 61} The state also has a parens patriae interest in preserving the welfare of its children. Parens patriae means "parent of his or her country" and refers to the state in its role as "sovereign," or the state in its capacity as a provider of protection to those unable to care for themselves. *Steele v. Hamilton Cty. Community Mental Health Bd.* (2000), 90 Ohio St.3d 176, 736 N.E.2d 10, fn. 5. Generally, the state cannot intervene as parens patriae in matters of child custody and control unless the child is delinquent, neglected, or abused or the parents are unfit. *Holderle v. Holderle* (1967), 11 Ohio App.2d 148, 159, 40 O.O.2d 305, 229 N.E.2d 79.

■ {¶ 62} Appellees present no compelling governmental interest for interfering with appellant's fundamental right to raise her daughter as she sees fit. There is nothing in the case at bar indicating that appellees' petition for visitation arose to prevent actual or potential harm to Laken. It is undisputed that appellant is a fit parent, so there was no reason for the court to intervene as parens parentiae. Furthermore, appellees did not seek visitation on the basis that they had functioned as de facto parents to Laken, which may at times serve as a compelling governmental interest in nonparental-visitation cases. See, e.g., *Rideout v. Riendeau* (Me.2000), 761 A.2d 291, 301.

{¶ 63} At the July 1, 1999, visitation petition hearing, when appellee Irene Oliver was asked why she wanted to have visitation with Laken, she replied:

{¶ 64} "Well, I think she has the right to know the other side. I've seen cases where people want to know there [sic] parents, grand parents, why not learn what we are like growing up with us, and know their nieces or cousins that they have. I think it's her right to know her cousins."

{¶ 65} Although appellee's attitude may be admirable, it does not reflect a compelling reason to interfere with appellant's right to control who does and does not come into contact with her child.

{¶ 66} It is clear from *Troxel* that the "special weight" that must be given to a parent's childrearing decisions has constitutional implications, and to overcome that "special weight," there must be some showing of compelling reasons and circumstances to disregard the parent's wishes. We find no such compelling reasons either in the nonparental-visitation statute or the evidence presented in this case. Because we find no compelling interest at stake, it is also apparent that we cannot find that the resulting visitation order was narrowly tailored to achieve a compelling interest. Therefore, *as applied to the facts of this case,* the trial court's decision must be overturned.

■ {¶ 67} Typically, we would remand a case such as this for further proceedings. This matter has been remanded once. On remand the trial court did not give any type of special weight to appellant's wishes. The trial court also

presumed that visitation with the grandparents was in the child's best interests. This presumption was rejected in *Troxel*, which held that a fit parent's wishes are presumed to be in the child's best interest. *Troxel*, 530 U.S. at 71–72, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 68} Additionally, instead of giving appellant's safety and health concerns special weight, the trial court discredited those concerns and concluded that "these are not safety issues, rather they are examples of grasping in an attempt to find issues that do not exist." (May 4, 2001 Judgment Entry.)

{¶ 69} The trial court concluded that the only significant explanation for appellant's refusal to allow visitation was that appellant's mother was against such visitation. It should be noted that appellant's mother did not testify in the visitation proceedings. Our review of the record indicates that the evidentiary basis for the trial court's conclusion could only have been the earlier hearsay and opinion testimony of one of appellant's co-workers. Nevertheless, the trial court concluded: "This Court does not believe it is in a child's best interest to loose [sic] contact with grandparents, upon the untimely death of a parent, because of deference to some third party's wishes." (May 4, 2001 Judgment Entry.) It appears that the court fails to recognize that the "third party" to whom he refers is the child's mother.

{¶ 70} Unfortunately, it appears as though the trial court substituted its own judgment as to Laken's best interests and gave no weight at all to appellant's expressed wishes. While it appears the court was looking to *Troxel*'s "ideal world," the court's actions here do not comport with *Troxel*'s holding. We have before us precisely the type of unconstitutional state intervention that *Troxel* attempts to guard against: "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made." *Troxel*, 530 U.S. at 72–73, 120 S.Ct. 2054, 147 L.Ed.2d 49.

{¶ 71} For all of the aforementioned reasons, the decision of the trial court must be reversed and vacated. In keeping with *Troxel*, we enter judgment in favor of appellant.

Judgment reversed.

VUKOVICH, P.J., and GENE DONOFRIO, J., concur.