OPINION
{¶ 1} Appellant Johanna Harman appeals an order of the Belmont County Juvenile Court which set a schedule of grandparents visitation. The issues presented are whether the court gave special weight to the mother's wishes and whether the court properly applied a prior consent order. For the following reasons, the trial court's decision is reversed because the consent order specifically provided that the effect of the mother's failure to cooperate would be a motion by the grandparents for visitation, the grandparents never filed a motion for visitation, and thus, the court did not consider the statutory factors for grandparents visitation.
 STATEMENT OF FACTS {¶ 2} Johanna Harman gave birth to a daughter on January 8, 2003. Ronald Street II was determined to be the father, and child support was ordered administratively. Although the mother acted as the sole custodian, no official orders concerning custody and visitation existed. Thus, on June 23, 2004, the mother filed a motion to allocate parental rights and responsibilities asking that she be appointed residential parent and that she receive the tax exemption. The father responded with his own motion asking for sole or shared parenting and the tax exemption.
 {¶ 3} When the case was called for hearing on August 4, 2004, the parties informed the court that an agreement had been reached. The father's counsel read his understanding of the agreement into the record. The mother would be the residential parent. The father would receive the tax exemption and more than standard visitation: every other weekend from Friday at 6:00 p.m. until Monday at 6:00 p.m., and on the alternating weeks, Wednesday at 6:00 p.m. until Thursday at 6:00 p.m. The father's counsel then stated:
 {¶ 4} "In addition as has been common practice, not as much Mr. Street but his parents have helped as Johanna has um, proceeded with her post high school education, it's (inaudible) considered that help, continue to help with babysitting. They will not be definite days, or definite times but it would be considered in a capacity similar to what they have done in the past. * * *" (08/04/04 Tr. 4).
 {¶ 5} "And just so there's no issue my clients understand that it's fully depended upon her (inaudible) scheduling and her need for the babysitting. * * * And basically this is if it would be a third party daycare provider, my client should be able to see the child there or pickup and deliver the child there. * * *" (08/04/04 Tr. 5).
 {¶ 6} "I'm sorry. Thank you. There was one other matter Your Honor we have brought it to your attention at pretrial. As referenced Mr. Street has (inaudible) spent a lot of time with the child, but his parents have spent a great deal of time also, in an effort to resolve this we didn't want Miss Harm[a]n to think that once this is resolved then the Streets were going to come back and file something else and she's going to have to come back to Court. So we're here to stipulate and they're here to put on the record that any potential for grandparents visitation would be commenced with this so that as long as these terms are complied with and the occasionally babysitting or whatever continues then there would be no need for them to ever proceed with their own filing." (08/04/04 Tr. 6).
 {¶ 7} The mother and the father then confirmed that this was their agreement and they are willing to comply. (08/04/04 Tr. 7). The paternal grandparents also confirmed that as long as there is compliance with the parenting time and babysitting time, they would not pursue their grandparents visitation rights. (08/04/04 Tr. 7-8). The court approved the agreement and asked that father's counsel prepare an entry within two weeks. Due to issues the mother had with the language used, the agreed entry was not signed by her counsel and filed by the court until October 5, 2004.
 {¶ 8} Section 1 covers the father's parenting time. After setting forth his time, Section 1C provides:
 {¶ 9} "The parties herein acknowledge that prior to and since the initial filings, Mr. Street and/or his parents, Ronald Street and Deborah Street, have provided day care assistance to Ms. Harman pursuant to her school and/or work schedule. Although a schedule with specifically identified days is not included herein, it is herein agreed that Mr. and Mrs. Street, as the paternal grandparents, shall continue to assist with day care in a format similar to what has been voluntarily undertaken by the parties prior to the initial filings."
 {¶ 10} Thereafter, Section 4 advises:
 {¶ 11} "It is further agreed that although Ronald Street and Debra Street had not filed a Petition to Establish Grandparents Rights, they wish to continue to cooperate with the afore described schedule and provide care and support for the child. Furthermore, it is herein agreed that so long as the above referenced terms and conditions continue as they have in the past and all parties abide by the terms set forth herein, neither Mr. nor Mrs. Street shall file an additional pleading seeking to establish visitation separate from that which is set forth herein."
 {¶ 12} On October 29, 2004, the father filed a motion to hold the mother in contempt for enrolling the child in a day care and not asking the paternal grandparents to baby-sit. The mother then filed a motion to modify the order concerning the grandparents. She noted that she only used the day care for short periods of time between her classes and that she worried about the grandparents because they do not comply with her requests concerning her child. She also revealed that the grandparents were babysitting every other Monday and every other Thursday while the father worked and that this was what was contemplated by the agreement when giving the father more than standard visitation even though he worked during parts of it. She expressed concern that if the prior order remains, they will file contempt motions against her every time she declines their babysitting services.
 {¶ 13} A hearing was held on December 22, 2004. The grandmother testified that she worked from 5:00 a.m. until 10:00 a.m. or 1:30 p.m. (Tr. 16). She stated that the grandfather worked twelve hours Friday night, twelve hours Saturday night, and ten hours on Sunday. (Tr. 27-28). Thus, she said that together they are available to baby-sit all week. The grandmother noted that her son (the father herein) stays at her house during his entire parenting time. (Tr. 19). Thus, the child is at her house every other weekend from Friday at 6:00 p.m. until Monday at 6:00 p.m. and every other Wednesday from 6:00 p.m. until the next day at 6:00 p.m. She also noted that her son is not home during his parenting time on Mondays and Thursdays so she and her husband watch the child those entire days. (Tr. 20-21).
 {¶ 14} The grandmother testified that during the spring quarter, she babysat the child on Tuesdays and Thursdays for eight hours while the mother was at school. (Tr. 23-24). She stated that under the agreement, she believed that if the mother had school for two hours here and there, she should be babysitting rather than a day care. (Tr. 26). Yet, she conceded that she never asked the mother if she could watch the child since the court order. (Tr. 25-26). She noted that it takes her twenty-five minutes to get to the court-ordered exchange point. (Tr. 27).
 {¶ 15} The grandmother testified that due to a recent flood that requires her to rebuild her house, she lives in a two bedroom rental unit with her husband, and her son, with her other son (the father herein) and his child staying during visitation and a daughter that visits on school breaks. As for naps, she said that she only sometimes gives the child naps but knows that the mother wants her to take one every day. (Tr. 31). The grandmother also believed that the child does not exactly have a bed time. (Tr. 32).
 {¶ 16} The father confirmed that he stays with his parents whenever he has his child. (Tr. 34, 43). He interprets the agreement as his parents providing day care on an as needed basis over and above the time they baby-sit during his parenting time and that the child should thus be with his parents any time day care is needed. (Tr. 37-39, 48). He noted that he works at an excavation company four ten hour days, Monday through Thursday and some Fridays, weather-permitting. (Tr. 41-42). The father conceded that the mother gives the child a two hour nap each day but that the child's naps vary when he and his parents have the child. (Tr. 44). He also said that the child's bedtime varies between 9:00 p.m. and 10:00 p.m. even though the mother desires a set time. (Tr. 45).
 {¶ 17} The mother testified that she interpreted the agreement as allowing the grandparents to baby-sit for a similar amount of time as before, including the time they watch the child while the father is atwork. (Tr. 53). She noted that her fall quarter schedule contained lengthy breaks on all four days, during which she could easily pick up her daughter at the free daycare and spend time with her. (Tr. 55-57). She noted that this arrangement would not work out with the grandparents because: she would not get to see her daughter on her break; she often gets out of class unexpectedly early; and the grandparents have a habit of keeping her daughter longer than expected. She then testified to her winter quarter schedule.
 {¶ 18} The mother noted that the child was expected to take a two hour nap and go to bed at 9:00 p.m. She noted the problems she has after the child's weekends with her father and his parents. She concluded that if she had a long and straight day at school, she would consider the grandparents but where she has short days or choppy days, she would prefer the daycare. She then noted other perceived benefits of daycare, such as socialization and nap time.
 {¶ 19} On December 29, 2004, the court filed its entry granting the paternal grandparents visitation. The court found that the mother agreed to allow the grandparents to baby-sit in a format similar to that which she had previously voluntarily undertaken. The court found that the prior undertaking was two days per week at "either eight hours per day;" it appears the court meant, "either [four or] eight hours" since this is the range of hours set forth in the father's motion and since the use of "either" does not make sense when only one amount of time is set forth. The court interpreted the agreement as providing the grandparents with time over and above the parenting time provided for the father.
 {¶ 20} Thus, the court granted the grandparents visitation of one day a week for four hours as follows: every other Tuesday (of the week the father has midweek visitation) from 1:00 p.m. to 5:00 p.m., and every other Thursday (of the alternating week) from 1:00 p.m. to 5:00 p.m. The court noted, however, that the mother's school schedule would vary the next quarter and encouraged the parties to agree to visitation time on a schedule consistent with the terms of this order. The court concluded that the father failed to show sufficient evidence of contempt against the mother. The mother filed timely notice of appeal.
 ASSIGNMENTS OF ERROR {¶ 21} The mother sets forth the following three assignments of error:
 {¶ 22} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FAILING TO AFFORD THE PETITIONER-APPELLANT'S PARENTAL DECISION MATERIAL OR SPECIAL WEIGHT."
 {¶ 23} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION UNDER THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE BY GRANTING GRANDPARENT VISITATION RIGHTS."
 {¶ 24} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN INTERPRETING THE AGREEMENT MADE BETWEEN JOHANNA HARMAN, RONALD J. STREET, II AND HIS PARENTS, WHO WERE NOT EVEN PARTIES TO THIS ACTION."
 {¶ 25} Under her first two assignments, which she addresses together, the mother argues that the court failed to give her wishes special weight. She states that the grandparents spend all of the father's time with the child and she will continue to consider them when needed in the future, but there is no need for a court order requiring certain dates for grandparents visitation.
 {¶ 26} Under her third assignment of error, the mother states that she interpreted the agreement as the grandparents babysitting during the father's more than standard visitation to which she agreed to permit. She states that she never intended to give a separate right to grandparents visitation, concluding that she never agreed to a court-ordered grandparents visitation schedule.
 {¶ 27} The father's brief (where he is joined by his parents) is full of facts not in the record. He notes that there is no pending motion for grandparents visitation, but he fails to recognize the significance of that fact. The father contends that contrary to a prior decision of this court, the best interest factors already give special weight to the parent's decision and the parent's decision need not be elevated above the other best interest factors. In the alternative, he urges that the court did give special weight to the mother's wishes but that the best interest factors still balanced in favor of grandparents visitation.
 {¶ 28} The father also argues that no statutory evaluation is necessary when grandparents visitation is based upon a consent order. He states that the mother voluntarily agreed to grandparents visitation so she cannot now argue that it is unwarranted. He characterizes the court's action as merely providing parameters to a prior agreement and fixing previously non-fixed times.
 GRANDPARENT VISITATION LAW {¶ 29} Pursuant to R.C. 3109.12(A), if a child is born to an unmarried woman and paternity has been officially determined, the parents of the father and any relatives of the father may file a complaint requesting that the court grant them reasonable companionship or visitation rights with the child. See, also, R.C. 3109.11 (allowing relatives of a deceased parent to visitation); R.C. 3109.051(B)(1) (allowing any person to seek visitation with children who are the subject of a divorce, dissolution, annulment, or a child support proceeding). Under R.C. 3109.12(B), the court may grant such visitation if it determines that it is in the child's best interests considering all relevant factors including, but not limited to, the factors listed in R.C. 3109.051(D).
 {¶ 30} The best interests factors include the following: (1) the child's prior interaction and interrelationships with parents, siblings, and other persons related by consanguinity or affinity; (2) the geographical location of the relevant residences and the distance between them; (3) the available time, including, but not limited to, each parent's employment schedule, the child's school schedule and the child's and the parents' holiday and vacation schedule; (4) the child's age; (5) the child's adjustment to home, school and community; (6) the child's wishes and concerns as expressed to the court, if the court interviewed the child in chambers; (7) the child's health and safety; (8) the amount of time that will be available for the child to spend with siblings; (9) the mental and physical health of all parties; (10) willingness to reschedule missed visitation; (11) and (12) concerns of abuse or neglect; (13) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time; (14) whether either parent has established a residence or is planning to establish a residence outside this state; (15) in relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court; and (16) any other factor in the best interest of the child. R.C. 3109.051(D).
 {¶ 31} The United States Supreme Court evaluated a Washington state non-parental visitation statute which allowed such visitation if it was in the child's best interests. Troxel v. Granville (2000), 530 U.S. 57. The Court noted that a parent's interest in the care, custody, and control of their children is a fundamental right. Id. at 65, 77, 95. The Court also noted the traditional presumption that a fit parent will act in his child's best interest. Id. at 69. A plurality of the Court found the statute unconstitutional as applied due to its sweeping breadth. Id. at 73. They expressed a need to give a fit custodial parent's decision material or special weight. Id. at 70, 72.
 {¶ 32} This court interpreted Troxel stating, "the `special weight' requirement * * * means that the deference provided to the parent's wishes will be overcome only by some compelling government interest and overwhelmingly clear circumstances supporting that government interest."Oliver v. Feldner, 149 Ohio App.3d 114, 2002-Ohio-3209, ¶ 59. We opined that the parent's wishes and concerns must be elevated above the other factors by giving those wishes extreme deference. Id. We concluded that the judge in that case unconstitutionally interfered with the mother's fundamental right merely because he thought a better decision could be made. Id. at ¶ 70.
 {¶ 33} The Ninth District was recently confronted with a case where the trial court found that a grandparent's right to visitation is subject to a strict scrutiny analysis. Estate of Harrold v. Collier, 9th Dist. No. 03CA64, 2004-Ohio-4215, ¶ 19. That trial court stated that underTroxel, a parent's wishes will be overcome only by a compelling state interest supported by overwhelmingly clear circumstances. Id. The trial court then concluded that although review of the factors seemed to support visitation, based on Troxel, "there is insufficient proof to find that there are overwhelmingly clear circumstances to overrule the wishes of the parent." Id.
 {¶ 34} The appellate court, however, decided that the trial court erred in its interpretation and application of Troxel, noting that the holding of the United States Supreme Court was narrow. Id. at ¶ 20. The appellate court stated that the Troxel plurality's special weight language was merely dicta. Id. at ¶ 18. Thus, that court reversed and remanded for reconsideration of grandparents visitation under only the language of Ohio's statute. Id. at ¶ 20.
 {¶ 35} On December 1, 2004, the Ohio Supreme Court accepted a certified conflict between our Oliver case and the Ninth District'sHarrold case. The question certified for their review is: "Whether Ohio Courts are obligated to afford `special weight' to the wishes of the parents of minor children concerning non-parental visitation as outlined in Troxel * * *." The Supreme Court held oral arguments in Harrold on June 14, 2005. As will be explained infra, it is possible for this court to decide this case without reaching the issue certified in Harrold.
 EFFECT OF CONSENT ORDER {¶ 36} First, the consent order in this case primarily concerned the mother being named residential parent and the father receiving more than standard visitation. The grandparents were not parties in this case. Yet, they interjected themselves into the agreement.
 {¶ 37} Second, the mother believed she was agreeing not to complain that the father has extended visitation but leaves the child with his parents while he works on some of those extended visitation days. She agreed to consider using the grandparents to baby-sit for her, but she did not intend to commit her child to their care every hour that she was in school.
 {¶ 38} Third, regardless of her intent, the agreement merely contemplates cooperation. The language is precatory. The grandparents only agreed not to assert their potential rights for grandparents visitation if the mother gave them similar babysitting time as they were used to. (The mother claims that they are getting similar time due to their watching the child while the father works and due to the fact that the father stays with them whenever he has the child.) In any event, there has been no motion for grandparents visitation filed.
 {¶ 39} The trial court did not apply the relevant statute because the court was acting under the assumption that the mother agreed to visitation and that the court was merely setting the parameters of the prior consent order. However, the prior consent order contemplates the mother's noncompliance and a resulting motion for grandparents visitation. It does not contemplate contempt requests for failure to allow grandparents babysitting or clarification for the setting of specific times when the mother objects.
 {¶ 40} As the father's attorney stated when reading the agreement into the record, "as long as these terms are complied with and the occasionally babysitting or whatever continues then there would be no need for them to ever proceed with their own filing." (08/04/04 Tr. 6). He clearly anticipated that if the mother did not cooperate, then they would file their motion (not that she would be bound nonetheless). More importantly, Section 4 of the consent order specifically provides:
 {¶ 41} "Furthermore, it is herein agreed that so long as the above referenced terms and conditions continue as they have in the past and all parties abide by the terms set forth herein, neither Mr. nor Mrs. Street shall file an additional pleading seeking to establish visitation separate from that which is set forth herein."
 {¶ 42} Thus, the plain language of the agreement allows for the mother to decide not to provide babysitting time to the grandparents. Unlike the typical case where a court is faced with a grandparents visitation agreement, this agreement merely mentions that if the mother cooperates with the intent of the grandparents to provide babysitting while she is in school, then they will not fight her for specific visitation rights. Under the clear terms of the agreement, the only effect of the mother's perceived failure to cooperate is that the grandparents can now file a motion for grandparents visitation as provided for in R.C. 3109.12(A). The agreement did not provide a mandatory duty regarding grandparents visitation; rather, it expressed a desire to attempt cooperation with statutory avenues left open in case the mother failed to cooperate.
 {¶ 43} The father filed a motion for contempt, but the court found that there was no evidence of contempt. Although the grandparents testified that the mother was not complying with the agreement, they never filed a motion for grandparents visitation. Still, the court set specific times for grandparents visitation (in addition to the time the child stays with them during the father's parenting time and in addition to the time they baby-sit for the father).
 {¶ 44} However, a motion invoking R.C. 3109.12, a hearing, and a decision considering the best interests factors were all required in order for the court to set specific dates and times for grandparents visitation over the mother's objection. Under the unambiguous terms of the agreement, the mother could refuse to utilize their services, and the grandparents then could file their motion. The court skipped a step here. Since no motion was filed, the statute was never invoked. The court never applied the grandparents visitation statute or evaluated the best interests of the child under the relevant factors.
 {¶ 45} The court properly found that the mother was not in contempt. The court then should have either ended the case with that finding, or the court could have granted the mother's motion to modify and advised the grandparents that they could now file their threatened motion.
 {¶ 46} Because the trial court's decision was based solely on a consent order, there is no need for this court to evaluate whether separate grandparents visitation is appropriate or constitutional in this case at this point. As such, we need not wait for the Ohio Supreme Court's decision in Harrold.
 {¶ 47} In conclusion, the consent order expressly contemplated the mother refusing babysitting services and the grandparents responding with a motion under R.C. 3109.12. The remedy for her refusal was not contempt or a setting of definite times.
 {¶ 48} For the foregoing reasons, the judgment of the trial court is hereby reversed.
Donofrio, P.J., concurs.
DeGenaro, J., concurs.