*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2015 UT 84**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

TRACY JONES AND ELLIE JONES,
*Petitioners,*

*v.*

SHARON JONES,
*Respondent.*

No. 20130815
Filed September 16, 2015

On Certiorari to the Utah Court of Appeals

Third District, Salt Lake
The Honorable Judith S.H. Atherton
No. 094904262

Attorneys:

Bryant J. McConkie, Adam Wentz, Salt Lake City, for petitioners

Paul R.Q. Wolfson, Shirley Woodward, Sonya L. Lebsack, Washington, D.C., Anthony C. Kaye, Emily Wegener, Salt Lake City, for respondent

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, and JUDGE FAUST joined.

Having recused herself, JUSTICE DURHAM does not participate herein; DISTRICT COURT JUDGE ROBERT P. FAUST sat.

JUSTICE PARRISH sat for oral argument. Due to her resignation from this court, however, she did not participate herein.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1 In this case we consider the legal basis for an order of visitation for a child's grandparents, issued over the wishes of the parent. The order in question was issued after a trial under the terms of Utah Code section 30-5-2. Our court of appeals invalidated the order as a violation of the custodial parent's constitutional right to the custody, care, and control of her child. *Jones v. Jones*, 2013 UT App 174, ¶¶ 32–35, 307 P.3d 598.

¶2 We affirm the judgment of the court of appeals. In so doing, we hold that a visitation order under section 30-5-2 is subject to strict scrutiny review, requiring proof that a grandparent visitation order is narrowly tailored to advance a compelling governmental interest. Under the operative statute as applied by the district court in this case, we find only one interest that even arguably qualifies as compelling—a showing of "harm" resulting from the loss of a "substantial relationship" with a grandparent, where the grandparent "acted as the grandchild's custodian or caregiver." UTAH CODE 30-5-2(2)(d). And finding no such proof on the record here, we hold that the grandparents failed to establish a legally sufficient basis for an order of visitation.

I

¶3 In November of 2007, I.J. was born to Sharon Jones[1] and Tracy Jones Jr., her then-husband. Tracy's parents, Tracy Sr. and Ellie Jones, lived more than an hour away. They visited their granddaughter and her parents about once or twice a month. Occasionally they also babysat.

¶4 Sharon and Tracy Jr. had a troubled marriage. Evidence in the record indicates that Tracy Jr. struggled with addiction and was physically and emotionally abusive. The couple divorced when I.J. was around fourteen months old. Custody was split equally between them at that time.

¶5 For six weeks, beginning in late January of 2009, Tracy Jr. moved in with his parents. During this time, I.J., who was less than eighteen months old, spent several days a week in her

---

[1] Sharon has since remarried and now goes by the name of Sharon Dunn.

grandparents' home with Tracy Jr. And when Tracy Sr. and Ellie were not at their full-time jobs, they took part in the day-to-day care of I.J.—changing diapers, feeding, etc. In early May of that same year, Tracy Jr. died of a heroin overdose while I.J. was in his custody. Once authorities discovered Tracy Jr.'s body—and I.J., who was alone in her deceased father's care—they returned I.J. to her mother's custody.

¶6   From this point on, I.J.'s grandparents and mother began to disagree over visitation. Tracy Sr. and Ellie requested overnight visits with their granddaughter, but Sharon felt that I.J. was not ready. She told the grandparents that I.J. was "struggling" to understand what had happened to her father, and that she thought it was best that she try to "get [I.J] back into a routine" before allowing the grandparents to take I.J. for weekend or overnight trips. Instead Sharon proposed that the grandparents call twice a week and that they plan sporadic "day visits." The grandparents were not happy with this arrangement. They asked to "have every other weekend with [I.J.] (Friday night to Sunday night)." But for a time they respected Sharon's wishes and accordingly stuck with phone calls and occasional day visits.

¶7   In time, however, the grandparents thought better of this arrangement. They renewed their request for an overnight weekend visit. When Sharon denied this request (explaining that she had scheduled time with other family members on the weekend in question), the grandparents accused her of "stripping" them of their relationship with I.J. They then demanded the right to take I.J. for two weekends a month from Friday through Sunday, to have a summer vacation with I.J. each year, and to have a right of visitation on all major holidays and on I.J.'s birthday. When Sharon did not reply, the grandparents followed up with an email threatening to sue for a right of visitation. Sharon then made a counter-offer—of visitation on one Saturday every other month, with the condition that she or another family member be present during the visit. The grandparents responded that they would "see [her] in court." They then filed a petition for visitation under Utah Code section 30-5-2.

¶8   In their visitation petition, the grandparents sought unsupervised visitation with I.J. for two weekends a month (from Friday evening through Sunday evening), two full consecutive weeks during the summer for a vacation, and half of all major hol-

idays and I.J.'s birthdays. In evaluating the basis for this request, the grandparents' expert, Dr. Heather Walker, observed I.J.'s interactions with her grandparents to assess whether (a) they were "fit and proper persons to have visitation"; (b) visitation "ha[d] been denied" to them; (c) they had "acted as a grandchild's custodian or caregiver"; (d) visitation was "in the best interest of the grandchild," based on an assessment of the "nature and extent and degree of the child's natural attachment to her grandparents," how well they interacted with each other, "the child's preferences," and how contact with the grandparents might "affect the child's ability to deal with the death and loss of her father." After reading some affidavits, spending twenty minutes or so with Sharon, and observing I.J.'s interactions with her grandparents for about an hour, Walker prepared an expert report. She concluded that I.J. "should have time with her grandparents" for "her emotional well[-]being and her best interest."

¶9 A two-day trial was then held on the visitation petition. Walker testified that I.J. was perfectly comfortable in the presence of her grandparents and that their relationship appeared to be "positive." She then began testifying, over Sharon's counsel's objection, to something nowhere explicitly contained in her report—that it would be "harmful" to I.J. to have her relationship with her grandparents severed or too limited. Specifically, Walker expressed concerns that I.J. not knowing her deceased father's parents could potentially be "harm[ful]" to her in that she might "overidentify" with her deceased father and "put him on a pedestal" and thereby commit the same kinds of life mistakes he had made because she would not be "allowed to grieve and realize[] that there were good and bad [things] about [her] father." Walker further expressed "concern" about I.J. living in Price, Utah, because of its small size and the associated chance that I.J. might run into her grandparents. In her view, if that happened and I.J. were suddenly "whisked away," it "would be kind of strange" for her because she might remember her grandparents but not understand why she couldn't speak with them. She further concluded that "[i]t could be kind of [a] potentially . . . huge problem" in the future when I.J. started school in Price because people at the school might know her grandparents (on account of the small community) and therefore those people might "start making comments to her," thus resulting in some species of harm.

¶10 On cross-examination, Sharon's counsel challenged the basis of Walker's opinions. When asked whether there was "any re-

search that suggests that a[n] [eighteen-month old] child's memory of a deceased father . . . has any developmental impact on the child's ability to grow up and be a well-adjusted human being," Walker responded "no." When asked whether she could "conclude that a child has a substantial relationship with a grandparent if it's not clear to you whether or not they are attached to that grandparent?," Walker responded as follows: "You can if the child is older [than I.J. was]. It's probably easier to determine the substantiality of the relationship [in that circumstance]." But on account of I.J.'s age (being younger than two), Walker simply had "to go by what people have said" with respect to there being a substantial relationship between I.J. and Petitioners. She then admitted twice that she "could not conclude that there was any attachment between [I.J.] and the [Petitioners]."

¶11 Sharon's counsel also questioned Walker's conception of what counts as "harm" under the statute. When Walker insisted that visitation was appropriate because it "would be in [I.J.'s] best interest," Sharon's counsel challenged the basis for any allegation of "harm" to I.J. Counsel suggested that Walker's testimony was really "dealing more with [her] evaluation of . . . [I.J.'s] best interests." In response, Walker indicated that was "correct," but suggested that "lack of best interest would be harm." Counsel then pressed Walker further, asking whether she thought there was any "difference between what's in the best interest of a child and whether or not something will cause them emotional harm." Walker said there was a difference but that "what is in a child's best interest would be for them to not have the possibility of emotional harm," and that in her opinion there was such a possibility here based on her earlier testimony. Based on her observations, Walker recommended one daytime visit per month for somewhere between three to seven hours per visit. And, in Walker's opinion, overnight visits might be appropriate in a few years.

¶12 Sharon put on her own expert, Dr. Monica Christy. Christy similarly challenged Walker's conclusions, testifying that "there's no research showing that in a normal grandparent relationship there would be harm done to the child if that grandparent was not available." She concluded that the only established "harm" that would accompany the "loss of a grandparent" relationship would be "[i]f they were the primary caretaker," or played "a parent-type role" in the child's life.

¶13 The court ruled in favor of the grandparents. It found that Sharon was "a very fit, proper, caring mother," but nonetheless

concluded that the grandparents had rebutted the statutory presumption "that a parent's decision with regard to grandparent visitation is in the grandchild's best interest." The court further concluded that Sharon had "denied and unreasonably limited" visitation; the grandparents had a "substantial relationship with [I.J.]"; the denial of visitation had "likely caused harm to [I.J.]"; and that grandparent visitation was in I.J.'s "best interest." The court consequently ordered unsupervised visitation every other weekend, alternating between overnight visits from Friday to Saturday evenings and eight-hour visits on Saturday afternoons.

¶14 Sharon subsequently sought to place certain limitations on the grandparents' visits with I.J. She asked that a member of her family drop I.J. off (rather than having the grandparents pick her up), that they refer to themselves as "Ellie and Tracy," and that they not take I.J. to any fast-food restaurants. In response, the grandparents canceled the first planned visit and initiated a contempt proceeding. The district court reserved ruling on the motion but held that the grandparents were entitled to disregard some of Sharon's restrictions (the requests as to fast-food and drop-off).

¶15 Sharon appealed, challenging the trial court's visitation order as an infringement of her fundamental rights as a parent. The court of appeals reversed, holding that strict scrutiny applied, that there was no compelling interest supporting the visitation award, and that the award was not narrowly tailored. *Jones v. Jones*, 2013 UT App 174, ¶¶ 24, 32–35, 307 P.3d 598. Specifically, the court of appeals reasoned that the government's interest in ordering visitation with the grandparents was not compelling because there was insufficient compelling evidence that "Grandparents had a substantial relationship with Child and that Child would be harmed by denied visitation." *Id.* ¶ 32. Further, the court held that the court-ordered visitation was not narrowly tailored, even if there was a compelling interest, as the "level of visitation [ordered] . . . . is more substantial than the visitation many grandparents enjoy, especially those who, like Grandparents here, live in a different city from their grandchild." *Id.* ¶ 35.

¶16 Petitioners sought a writ of certiorari, which we granted. Our review of the court of appeals' decision is de novo. *State v. Ramirez*, 2012 UT 59, ¶ 7, 289 P.3d 444. In reviewing the court of appeals' decision, however, we consider whether it "accurately

reviewed the trial court's decision under the appropriate standard of review." *Id.* (internal quotation marks omitted).

II

¶17 The case before us presents both statutory and constitutional questions. To sustain an order of visitation under Utah Code section 30-5-2, the grandparents bore the burden of rebutting a "presumption that a parent's decision with regard to grandparent visitation is in the grandchild's best interests"—a burden informed by "factors" enumerated in the statute. UTAH CODE § 30-5-2(2). Under controlling precedent from the U.S. Supreme Court, any decision to override a parent's decision regarding visitation is also subject to scrutiny under the Due Process Clause of the Fourteenth Amendment. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000). Thus, the grandparents' right to visitation in this case is sustainable only if the order in question also survives under the governing standard of constitutional scrutiny.

¶18 That much is clear. The governing statutory and constitutional standards are less so. The statute enumerates "factors" that the court may "consider[] to be relevant" in deciding whether grandparents have rebutted the presumption in favor of the parent's decision regarding visitation. UTAH CODE 30-5-2(2). But it doesn't say much more. It doesn't tell us how those factors are to be balanced or weighted.

¶19 The constitutional standard is even fuzzier. The fuzziness stems from the governing decision in *Troxel*, 530 U.S. at 57. *Troxel* recognized a fundamental right of parents to limit grandparent visitation. *Id.* at 72–73. And it struck down a Washington visitation statute on constitutional grounds—as applied in a case in which a trial judge's "mere disagreement" with the parent's determination of the effect of visitation on the child's "best interests" was deemed sufficient to sustain a grandparent visitation order. *Id.* at 67–69. Yet the plurality opinion in *Troxel* declined to "define . . . the precise scope of the parental due process right in the visitation context" or to articulate the operative standard of scrutiny. *Id.* at 73. Instead of prescribing a constitutional standard, the plurality struck down the Washington statute as applied based on a case-specific opposition to the operation of the Washington provision in question—expressing concerns as to the "sweeping breadth" of a statutory provision that permitted "any person" to be awarded

visitation at "any time" based purely on a "best interest" analysis that failed to give any "special weight" to the presumption in favor of a parent's assessment of a child's welfare. *Id.* at 61, 69.

¶20 That decision resolved the constitutional question in *Troxel*. But it yielded little guidance for lower courts going forward. From *Troxel* we know that parents have a fundamental right to make decisions about visitation, that their decisions are entitled to "special weight," and that the presumption in favor of their decisions may not be overridden by a "mere disagreement" over a child's best interests. But we know little more than that. We do not have a clear statement of the operative standard of scrutiny—and thus no way to know exactly how much "special weight" the parent's decision gets or what kind of proof is required to overcome it. *See id.* at 80 (Thomas, J., concurring in the judgment) (identifying this concern).

¶21 Case-by-case decisionmaking of this sort is perhaps understandable. In matters as sensitive and difficult as grandparent visitation, the course of case-by-case balancing may seem to represent the course of judicial restraint. In the broad run of cases in the lower courts, however, the *Troxel* approach paves a path for uncertainty. To decide a case like the one pending before us today we must identify and apply a standard of scrutiny.

¶22 We do so in the paragraphs below. First, we conclude that the high court's recognition of a "fundamental" right of a parent to regulate the visitation of a child implies a standard of strict scrutiny. That standard, we conclude, requires a party seeking to override a parent's decision on visitation to present concrete proof that a visitation order is narrowly tailored to advance a compelling government interest. Second, turning to the district court's decision under the Utah statute, we find only one interest evaluated by the court that even arguably qualifies as compelling— proof of "harm" resulting from the loss of a "substantial relationship" with a grandparent, as where the grandparent "acted as the grandchild's custodian or caregiver." UTAH CODE § 30-5-2(2)(d). We resolve this case based on a failure of proof under this statutory factor.

¶23 In so doing, we leave for another day the precise content of the compelling interest test that governs in this area. We need not and do not decide whether the interference with a grandparent's

"custodian or caregiver" relationship would be enough to sustain a visitation order under the standard of strict scrutiny. Instead we simply find a lack of record support for the statutory harm asserted by the grandparents and accepted by the district court in this case (leaving for a future case the question whether such harm would be sufficient as a matter of strict scrutiny).[2]

## A

¶24 The courts that have confronted the question of the standard of scrutiny under *Troxel* have charted a range of courses. Most have adopted a standard of strict scrutiny, or at least a requirement of proof of substantial "harm" as a prerequisite to an award of third-party visitation.[3] But others have applied a somewhat

---

[2] In affirming the judgment of the court of appeals—and vacating the visitation order—on this basis, we do not reach the question of narrow tailoring. Thus, we do not consider the question whether the visitation order in question may also fall short on the ground that it was more extensive than necessary to protect any compelling governmental interest. *Jones v. Jones*, 2013 UT App 174, ¶¶ 34–35. The court of appeals thought so because the time for ordered visitation was "more substantial than the visitation many grandparents enjoy, especially those who, like Grandparents here, live in a different city from their grandchild." *Id.* ¶ 35. That may or may not be the right yardstick for measuring narrow tailoring. At least arguably, there could be a case in which the most narrow basis for avoiding substantial harm to a child would be to award visitation greater than that available to "many grandparents." We do not reach that question, however, as we resolve the case on different grounds.

[3] *See Ex parte E.R.G.*, 73 So. 3d 634, 645–46 (Ala. 2011); *Linder v. Linder*, 72 S.W.3d 841, 855 (Ark. 2002); *Roth v. Weston*, 789 A.2d 431, 441–42 (Conn. 2002); *Doe v. Doe*, 172 P.3d 1067, 1077 (Haw. 2007); *Lulay v. Lulay*, 739 N.E.2d 521, 532 (Ill. 2000); *In re Marriage of Howard*, 661 N.W.2d 183, 188–89 (Iowa 2003); *Koshko v. Haining*, 921 A.2d 171, 187, 191 (Md. 2007); *Blixt v. Blixt*, 774 N.E.2d 1052, 1059 (Mass. 2002); *SooHoo v. Johnson*, 731 N.W.2d 815, 821 (Minn. 2007); *Moriarty v. Bradt*, 827 A.2d 203, 222 (N.J. 2003); *Hiller v. Fausey*, 904 A.2d 875, 885 (Pa. 2006); *Smallwood v. Mann*, 205 S.W.3d 358, 362 (Tenn. 2006); *Glidden v. Conley*, 820 A.2d 197, 205

(continued . . .)

looser standard, opening the door to more discretionary balancing by the court.[4]

¶25 Uncertainty in the operative constitutional standard is troubling. The stakes are high in a matter of rights of visitation. We owe it to the parties to identify the operative standard of scrutiny. Anything less leaves the appearance of case-by-case policy-making. We therefore confront the question that the high court has left unresolved.

¶26 We start with the threshold premise that the court has established—that a parent's right to decide who has a right of visitation with her child is "fundamental" under the Due Process Clause. *Troxel*, 530 U.S. at 66. That premise is dispositive. When the court has recognized a due process right it deems "fundamental," it consistently has applied a standard of strict scrutiny to the protection of such a right.[5]

---

(Vt. 2003); *In re Parentage of C.A.M.A.*, 109 P.3d 405, 410 (Wash. 2005).

[4] *See Crafton v. Gibson*, 752 N.E.2d 78, 91–92 (Ind. Ct. App. 2001) (using rational basis test); *W. Va. ex rel. Brandon L. v. Moats*, 551 S.E.2d 674, 684–85 (W. Va. 2001) (using various factors to weigh best interest of the child against whether there is substantial interference with parental rights).

[5] *See, e.g., Lawrence v. Texas*, 539 U.S. 558, 593 (2003) ("Our opinions applying the doctrine known as 'substantive due process' hold that the Due Process Clause prohibits States from infringing *fundamental* liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest."); *Reno v. Flores*, 507 U.S. 292, 301–02 (1993) ("[A] 'substantive due process' claim relies upon our line of cases which interprets the Fifth and Fourteenth Amendments' guarantee of 'due process of law' to include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." (emphasis omitted)); ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 10.1 (4th ed. 2011) ("The Supreme Court has held that some liberties are so important that they are deemed to be 'fundamental

(continued . . .)

¶27 The strict scrutiny standard is a stiff one. Under this standard, a fundamental right is protected except in the limited circumstance in which an infringement of it is shown to be "narrowly tailored" to protect a "compelling governmental interest."[6]

¶28 This is not the only standard that conceivably could apply. In a few instances the high court has invoked *sui generis* standards of scrutiny in cases involving rights it deems "fundamental" (but nonetheless subject to some lower level of protection).[7]

¶29 Perhaps the high court, in time, will embrace some sort of intermediate standard of scrutiny for child visitation cases. But the enterprise of so doing—of abandoning the usual standard for a lesser one that balances the relevant interests in a new way—is an uncomfortable venture for a lower court. Such a venture seems more an act of policymaking than of application of controlling law. So, unless and until the United States Supreme Court prescribes a different standard in this field, we are left to view its determination of a fundamental parental right of control over visitation as the prescription of the standard of strict scrutiny.[8]

---

rights' and that generally the government cannot infringe upon them unless strict scrutiny is met.").

[6] *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (articulating this standard for fundamental rights under the Due Process Clause); *Reno*, 507 U.S. at 302 (same).

[7] *E.g., Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 874 (1992) (adopting "undue burden" test for assessment of infringement of fundamental right of abortion); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (applying a "balancing approach" for assessment of infringement of fundamental right to vote); *Zablocki v. Redhail*, 434 U.S. 374, 386 (1978) (alluding to "the fundamental character of the right to marry" while suggesting that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed").

[8] Such a determination is not, as the grandparents in this case argue, foreclosed by our precedent. Our lone decision in the wake of the *Troxel* decision is *Uzelac v. Thurgood*, 2006 UT 46, 144 P.3d 1083. *Uzelac* upheld a grandparent visitation order over a constitu-

(continued . . .)

¶30 That leaves the matter of defining the interests that are sufficiently "compelling" to satisfy strict scrutiny in this field. Although *Troxel* itself does not answer that question, other opinions of the court in this area provide helpful guidance. To sustain an incursion on a fundamental right of a parent, the U.S. Supreme Court has required proof that substantial harm to a child is at stake. *See, e.g., Parham v. J.R.*, 442 U.S. 584, 602–03 (1979); *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944).

¶31 The court's cases do not give an exhaustive list of harms that may qualify, but the examples in its cases suggest that the bar is a high one. The state may override a parent's right to direct the upbringing of a child, for example, in a case involving proof of "child neglect and abuse," where the child's "physical or mental health is jeopardized," *Parham*, 442 U.S. at 602–03, or where a parent is "unfit" in a manner causing a potential "harm[]" to the child, *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534 (1925).[9]

---

tional challenge asserted by a parent. And, as the grandparents in this case note, the *Uzelac* decision did so without embracing a standard of strict scrutiny (or any other standard). Instead, we upheld the order in question based on our sense of the facts of the case—that the grandmother had taken "care of the child on a daily basis throughout most of the child's first four years of life," and that expert testimony established that "the loss of contact with the [grandparents]" would have been "devastating and cause[d] the child to suffer." *Id.* ¶ 42.

[9] *See also Santosky v. Kramer*, 455 U.S. 745, 767 & n.17 (1982) (state's *parens patriae* power of termination "arises only at the dispositional phase, *after* the parents have been found unfit"); *Wisconsin v. Yoder*, 406 U.S. 205, 230 (1972) (requiring proof of "harm to the physical or mental health of the child" to sustain a state law compelling high school attendance over the religious objections of parents); *Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (agreeing that "neglectful parents may be separated from their children"); *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) (noting there is a "private realm of family life which the state cannot enter . . . . [but that parental rights] do[] not include liberty to expose . . . . the child to communicable disease or . . . . to ill health or death");

(continued . . .)

¶32 The foregoing shows that the state interest in overriding a parent's fundamental rights is "compelling" only in circumstances involving the avoidance of harm that is *substantial*.[10] But it hardly paints a bright line of the standard of substantiality. We know from *Troxel* that a mere conclusion that a child's "best interests" may be advanced by an award of visitation is insufficient. 530 U.S. at 67. Beyond that, however, it is difficult to do more than to say that proof of substantial harm is required.

---

*Meyer v. Nebraska*, 262 U.S. 390, 403 (1923) (holding that the targeted evil of the statute—children being taught a modern foreign language—"is not injurious to the health, morals or understanding of the ordinary child . . . . [and that] [n]o emergency has arisen . . . . so clearly harmful as to justify its inhibition with the consequent infringement of [parental and constitutional] rights long freely enjoyed").

[10] Other courts have reached similar conclusions. *See Oliver v. Feldner*, 776 N.E.2d 499, 507 (Ohio Ct. App. 2002) ("It is clear from *Troxel* that a strict-scrutiny analysis must be applied to both the nonparental-visitation statute and to the method in which the statute is applied . . . ."); *Santi v. Santi*, 633 N.W.2d 312, 317 (Iowa 2001) (observing that "the [*Troxel*] Court left no doubt about the status of parents' interest in the care, custody and control of their children," and holding that the recognition of a fundamental right triggered strict scrutiny analysis); *Hiller v. Fausey*, 904 A.2d 875, 885 (Pa. 2006) (concluding that strict scrutiny applied despite the fact that "the United States Supreme Court declined in *Troxel* to articulate a standard of review regarding infringements of this fundamental right"); *Roth v. Weston*, 789 A.2d 431, 441 (Conn. 2002) ("[C]onsistent with the [*Troxel*] court's determination that a parent's interest in the care, custody and control over his or her children is 'perhaps one of the oldest of the fundamental liberty interests recognized by [the] Court[,]' the application of the strict scrutiny test is required to any infringement it may suffer." (alteration in original)); *see also Rideout v. Riendeau*, 761 A.2d 291, 300, 303 (Me. 2000) (upholding state's grandparent visitation statute under *Troxel* after applying strict scrutiny); *Harrold v. Collier*, 836 N.E.2d 1165, 1171–73 (Ohio 2005) (same).

¶33 We so hold. But in so doing we stop short of attempting to define the compelling interest line with greater precision. Instead we avoid that question on the statutory grounds applied below: We find only one basis in the statutory standard invoked by the district court that could even arguably qualify as establishing any substantial harm, and, absent evidence to support a showing of such harm in this case, we affirm the court of appeals' decision vacating the visitation order entered in this case.

B

¶34 Utah Code section 30-5-2 prescribes a presumption in favor of parents' decisions regarding visitation. Consistent with the *Troxel* decision, the statute requires a grandparent seeking visitation to rebut a "presumption that a parent's decision with regard to grandparent visitation is in the grandchild's best interests." UTAH CODE § 30-5-2(2). Beyond that, the statute gives little guidance as to the basis for rebutting the presumption. It directs only that the court may grant "reasonable rights of visitation" to grandparents if it "finds that the petitioner has rebutted the presumption based upon factors which the court considers to be relevant." *Id.* Then, without indicating how the listed factors are to be balanced or weighted, the statute prescribes a list of potentially relevant considerations—whether:

> (a) the petitioner is a fit and proper person to have visitation with the grandchild; (b) visitation with the grandchild has been denied or unreasonably limited; (c) the parent is unfit or incompetent; (d) the petitioner has acted as the grandchild's custodian or caregiver, or otherwise has had a substantial relationship with the grandchild, and the loss or cessation of that relationship is likely to cause harm to the grandchild; (e) the petitioner's child, who is a parent of the grandchild, has died, or has become a noncustodial parent through divorce or legal separation; (f) the petitioner's child, who is a parent of the grandchild, has been missing for an extended period of time; or (g) visitation is in the best interest of the grandchild.

*Id.*

¶35 In the trial proceedings leading to the visitation order in this case, the parties and the court focused on these statutory factors.[11] The grandparents presented evidence under several of the factors, and the district court's findings were guided by them. Ultimately, the basis of the visitation order was that the grandparents had rebutted the presumption "that a parent's decision with regard to grandparent visitation is in the grandchild's best interest." The decision was based on the following findings: Sharon had "denied and unreasonably limited" visitation with the grandparents; the grandparents had a "substantial relationship with [I.J.] until the denial of visitation, and the denial has likely caused harm" to I.J.; and visitation was in I.J.'s "best interest."

¶36 Our review of the basis for this decision must be informed by the above-noted constitutional limitations. To withstand strict scrutiny, a grandparent visitation order must be narrowly tailored to advance a compelling governmental interest, or in other words to protect against substantial harm to the child. The only harm mentioned expressly by statute—or considered expressly by the parties or the district court—is the interference with a "substantial relationship" between I.J. and her grandparents.[12] Even assuming

---

[11] That approach was not mandated by statute, and it may not be advisable in future proceedings in light of the standard of strict scrutiny that applies under the Due Process Clause. The statutory list is exemplary, not exclusive. And under the Constitution, the compelling governmental interest test requires proof of substantial harm to the child that would ensue absent a visitation order. So a grandparent seeking a visitation order over a parent's wishes would be advised to focus on establishing substantial harm—e.g., a real risk of injury to the child's mental health—in a manner supported by competent medical evidence. Proof of loss of a "substantial relationship" like that of a "custodian or caregiver" might be supportive of such proof. But in light of the strict scrutiny standard governing in this field, additional proof might well be advisable.

[12] The statute also recognizes another potential harm implicitly—in noting the potential relevance of a finding that the parent is "unfit or incompetent." UTAH CODE § 30-5-2(2)(c). A finding of unfitness or incompetence could quite likely sustain a compelling

(continued . . .)

for the sake of argument (and without resolving the matter conclusively) that the loss of a "custodian or caregiver" relationship would be enough to show substantial harm, however, there was insufficient evidence of such a relationship in this case. We affirm the court of appeals' vacatur of the visitation order on that basis.

¶37 The statutory "harm" that was the focus of the proceedings below concerned the loss of a "substantial relationship" of a specific sort—that of a "custodian or caregiver," or something along those lines. UTAH CODE § 30-5-2(2)(d). This limitation is important. In a very real sense, all grandparental relationships are "substantial." The cross-generational connection of a child to her grandparents is of unquestioned value and significance. But under *Troxel*, and particularly under the strict scrutiny standard that that decision seems to require, the mere (but unquestioned) significance of the grandparental relationship cannot be enough to override a parent's fundamental right to raise a child as she sees fit. Nor can a vague sense that the child would be better off with grandparents in her life. *See Troxel*, 530 U.S. at 67. Grandparent visitation orders must be limited to the exceptional case where the failure to override the parent's wishes would cause substantial harm to the child.

¶38 The exceptional case identified by statute (which we presume without deciding may be enough to satisfy strict scrutiny) is the case where the grandparents' role is akin to that of a parent—where the grandparent has filled the role of "custodian or caregiver" or something similar. No such proof was presented here.

¶39 By all accounts, the relationship between I.J. and her grandparents was a warm, healthy, loving one. And, as the grandparents' expert testified, there is reason to believe that "[t]he more time this child spends with her grandparents and paternal relatives, the better off she will be in terms of knowing and understanding that many people love her." But again a mere "best in-

---

basis for a grandparent visitation order. *See Stanley v. Illinois*, 405 U.S. 645, 649 (1972) (accepting that the state could deprive an unfit father of his parental rights, but requiring first that he be granted a hearing on his fitness before such action). But this factor was not implicated here, as the court found Sharon to be a "very fit, proper, caring mother."

terests" determination is insufficient to override a fundamental parental right. And the mere existence of a healthy, loving grandparental relationship falls short. By statute, the kind of "substantial relationship" that can sustain proof of "harm" to the child is that of a "custodian or caregiver" or the like.

¶40 The operative statutory provision encompasses not only those who "acted as the grandchild's custodian or caregiver," but also grandparents who "*otherwise . . .* had a substantial relationship with the grandchild." UTAH CODE § 30-5-2(2)(d) (emphasis added). Not every grandparental relationship counts as "substantial" under this provision, however. Under the *ejusdem generis* canon of construction, and in light of the doctrine of constitutional avoidance, we give a limiting construction to this provision. [13] We limit the "other[]" "substantial relationship[s]" encompassed by the cited provision to those that are comparable to a "custodian or caregiver" relationship.

¶41 The record cannot sustain a determination that the grandparents had that kind of relationship with I.J. This is not a case like *Uzelac v. Thurgood*, where the grandmother "took care of the child on a daily basis throughout most of the child's first four years of life," such that she had an "emotional attachment . . . as strong as [that] seen between parents and children" and the "loss of contact" would have been "devastating and caused the child to suffer." 2006 UT 46, ¶ 42 (alteration in original). Instead, the record in this case shows that the grandparents helped to care for I.J.

---

[13] *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned."); *State ex rel. A.T. v. A.T.*, 2001 UT 82, ¶ 12, 34 P.3d 228 ("The doctrine of *ejusdem generis* applies in instances where an inexhaustive enumeration of particular or specific terms is followed by a general term or terms that suggest a class. The doctrine declares that in order to give meaning to the general term, the general term is understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent.").

for three or four days a week over a six-week period in early 2009, when I.J. was not yet eighteen-months old. During that time, moreover, the grandparents were not the child's legal guardian or custodian. Her father, Tracy Jr., was the child's custodian, and he was living in the same household during that time. Throughout this six-week period, it appears that all three individuals—Tracy Jr. and his parents (I.J.'s grandparents)—shared in the responsibility of caring for I.J. The grandparents, after all, both worked full time, and Tracy Jr. was living in the home.

¶42 Given the nature of the grandparents' role and the short span of their involvement in I.J.'s day-to-day care, there is no basis for finding that they had a substantial "custodian or caregiver" type of relationship with their grandchild. This is reflected, in part, in the expert testimony. The grandparents' expert opined that the relationship was "positive" but stated that she "could not conclude that there was any attachment" between I.J. and her grandparents. The district court, moreover, never found that there was a "custodian or caregiver" type of relationship with I.J. It held only that the relationship was "substantial," in some vague sense, and that the cessation of such relationship "likely caused" some unidentifiable "harm" to the child. That is insufficient.

¶43 The evidence at trial did include some vague references to "harm" identified by the grandparents' expert. But the expert's testimony, for the most part, seemed to equate "harm" with any decision that is not in the child's best interest. And to the extent the expert alluded to the possibility of harm in the form of "developmental impact on the child's ability to grow up and be a well-adjusted human being," she conceded that there was no concrete basis or "research" to support that conclusion. Most important, moreover, is the fact that the district judge never found any harm of this sort. She simply found that the loss of the kind of (non-caregiver) relationship the grandparents had with I.J. "likely caused" harm—presumably in the same sense in which any child would be harmed by the loss of such a relationship.

¶44 That is insufficient under the statute, as informed by the standard of strict scrutiny. A grandparent visitation order requires proof of a potential for substantial harm to the child, and by statute the only harm that is implicated here is the loss of a substantial relationship like that of a custodian or caregiver. Absent such proof, we hold that the grandparents in this case failed

to carry their burden of showing that a visitation order was necessary to prevent substantial harm to the child.

## III

¶45 Family connections are fundamental stitches in the fabric of our society. It is hard to fault the grandparents in this case for seeking to preserve their relationship with their granddaughter. And we can understand the district judge's apparent interest in preserving a need for these grandparents to have a meaningful relationship with I.J. That is a laudable goal. As compassionate human beings we can hope that all grandparental relationships will be healthy, meaningful, and respected.

¶46 But court-ordered relationships are another matter. In this sensitive field the United States Supreme Court has recognized a fundamental right of parents to control the upbringing of their children. That means that parents, as a general rule, have the final say in who has a right to interact with their children on a regular basis. The rule is subject to an exception, but the exception was not met on this record. Thus, while we can hope that I.J. may one day develop a relationship with her grandparents, we cannot sustain an order requiring that outcome.

¶47 The judgment of the court of appeals is affirmed and the district court's visitation order is vacated. The court of appeals' opinion is vacated, however, as to its analysis of narrow tailoring. *See supra* ¶ 23 n.2. We remand for any further proceedings not inconsistent with this opinion.