# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GARY GLANDEN,[1] | § | |
| | § | No. 145, 2015 |
| Petitioner Below, | § | |
| Appellant, | § | |
| | § | Court Below – Family Court |
| v. | § | of the State of Delaware, in |
| | § | and for New Castle County |
| TERRY QUIRK, | § | |
| | § | File No. CN12-06151 |
| | § | Petition No. 12-35958 |
| Respondent Below, | § | |
| Appellee. | § | |

Submitted: October 28, 2015
Decided: December 7, 2015

Before **HOLLAND, VAUGHN,** and **SEITZ**, Justices.

Upon appeal from the Family Court of the State of Delaware.  **AFFIRMED.**

Curtis P. Bounds, Esquire, Bayard, P.A., Wilmington, Delaware, for Petitioner Below, Appellant, Gary Glanden.

Bonnie Egan Copeland, Esquire, Staci J. Pesin, Esquire, Cooch and Taylor, P.A., Wilmington, Delaware, for Respondent Below, Appellee, Terry Quirk.

**SEITZ**, Justice:

---

[1] The Court previously assigned pseudonyms to the parties under Supreme Court Rule 7(d).

# I.    INTRODUCTION

Husband appeals from a Family Court order dividing marital property and granting alimony to Wife following their divorce after twenty-two years of marriage. The court divided the non-retirement assets 65% in Wife's favor, and divided the remaining marital property equally. The court awarded alimony for an indefinite period.

Husband contends the trial judge erred by including in the marital estate part of a January 2013 payment from his law firm received after the couple separated. Husband also claims that the court abused its discretion by dividing the couple's assets favorably to Wife, and in awarding Wife alimony. We find that Husband's argument about his law firm payment is at odds with the plain language of his employment agreement, where the disputed payment represented "the balance of [Husband's] prior year's base compensation," and therefore was partially includable in the marital estate. We also find that Husband's other arguments essentially ask this Court to re-consider decisions within the Family Court's discretion, which are supported by the evidence established over the course of five hearings. Accordingly, we affirm the judgment of the Family Court.

## II.    FACTS AND PROCEDURAL BACKGROUND

Husband and Wife were married for twenty-two years. They separated in September 2012, and their divorce became final in 2013. The couple had over $6

million in assets, including a $1.5 million house, investment accounts, retirement accounts, and other property.

Husband worked as an associate and then as a partner in a major law firm, earning a substantial income. In May 2011, Husband transferred to another major law firm, signing an employment agreement on May 12, 2011. By the end of the marriage, Husband was earning over $3 million per year. While married, the couple lived a wealthy lifestyle, with an expensive home, multiple country club memberships, private school for their children, and expensive vacations.

Wife stopped working after the birth of their second child and did not work for the next two decades. Although she did not work outside the home for most of the marriage, the Family Court considered her contributions no less valuable than those of Husband. She took care of the children, the household, and Husband's elderly mother, while he worked long hours as an attorney. She was also involved with numerous charitable organizations. Following their divorce, she was able to find a job managing a start-up non-profit paying $40,000 per year, with the potential to earn bonuses of up to $35,000 per year.

After granting the divorce decree, the Family Court retained ancillary jurisdiction to divide the couple's property. The court settled on a 65% division in Wife's favor for the non-retirement marital assets, and an equal division of the remaining marital property, including retirement assets, debts, and travel award

3

points.  The court also determined that a $2.7 million payment from Husband's law firm in January 2013 was earned in 2012, and thus part of the payment was marital property.  This finding resulted in a net of $900,000[2] being included in the marital estate.

The court awarded Wife alimony of $13,643 per month.[3]  In arriving at this amount, the court considered the couple's standard of living and Wife's earning potential, including a 4.5% investment return she might earn on a portion of the investable assets she received in the property division.  The court then awarded her the difference between those amounts and her projected expenses. The court also excluded Wife's cost to buy a house from Wife's assets when it calculated her investment income.  Finally, the court ordered Husband to maintain insurance policies with Wife as the beneficiary to act as security in the event of his death and termination of alimony.

## III.   ANALYSIS

Although Husband raised a host of issues on appeal, they can be reduced to the following claims of error: (1) legal error when the Family Court misinterpreted Husband's employment agreement to require inclusion of a January 2013 payment

---

[2] The parties stipulated to this amount.  It reflects the disputed amount after accounting for taxes and proration for the nine months of marriage before their legal separation in September 2012.
[3] No. CN12-06151, at 7, 12 (Del. Fam. Jan. 9, 2015) [hereinafter Opinion II].  The Family Court issued the first opinion on September 19, 2014.  No. CN12-06151 (Del. Fam. Sept. 19, 2014) [hereinafter Opinion I].  After hearing reargument, the court issued Opinion II on January 9, 2015, to correct errors pointed out on reargument.

4

as income earned in 2012 for marital property purposes; and (2) abuse of discretion when the Family Court: (a) awarded Wife 65% of the non-retirement assets; (b) found that Wife was dependent and entitled to alimony; (c) excluded the cost of housing from the assets wife would be able to invest; (d) used a 4.5% rate of investment return; and (e) ordered Husband to maintain life insurance with Wife as beneficiary.

We review the Family Court's legal determinations *de novo*.[4] Where the Family Court correctly applied the law, we review only for abuse of discretion.[5] We will disturb the Family Court's factual determinations only if they are clearly wrong.[6]

### A. The January 2013 Payment

Husband and Wife separated in September 2012. Husband received a $2.7 million payment from his new law firm in January 2013. He argues that the payment falls outside the marital estate because the law firm made the payment in 2013 after the couple separated, and Husband and his law firm treated the payment as 2013 income for tax purposes. Wife claims in response that the payment was partially marital property because it was compensation Husband partially "earned" during the marriage according to the terms of his employment agreement. The

---

[4] *Roberts v. Roberts*, 19 A.3d 277, 280 (Del. 2011).
[5] *Id.*
[6] *Id.*

5

Family Court determined that part of the payment was marital property because Husband earned the payment in 2012, and the tax treatment of the payment was irrelevant for purposes of the marital property determination.

Under 13 *Del. C.* § 1513(b), "marital property" means "all property acquired by either party subsequent to the marriage" unless it falls under one of the four statutory exceptions, none of which apply here.[7] There is a presumption that all property acquired during the marriage is marital property, and therefore subject to division upon divorce.[8] Accounting and tax designations are not controlling when making marital property determinations.[9] Instead, the Family Court must consider when a spouse's income was actually earned, rather than when it was received, for marital property purposes.[10]

---

[7] 13 *Del. C.* § 1513(b). "Subsequent to the marriage" means after the date of marriage, not after the divorce.

[8] *Id.* § 1513(c).

[9] *Lynam v. Gallagher*, 526 A.2d 878, 881 (Del. 1987) ("[Though certain distinctions may be meaningful from a corporate accounting perspective,] they should not be determinative as between the parties to a marital property dispute . . . .").

[10] *Forrester v. Forrester*, 953 A.2d 175, 186 (Del. 2008) (property interest acquired during marriage even if not realized as cash until after marriage is marital property); *Gregg v. Gregg*, 510 A.2d 474, 480 (Del. 1986) ("Property interests not yet reduced to possession can be acquired during marriage within the meaning of § 1513, and if such an interest still exists at the time of a divorce, the interest is to be regarded as marital property."); *Sayer v. Sayer*, 492 A.2d 238, 241 n.4 (Del. 1985) ("[A]lthough [pension amounts] are not presently possessed they *are* presently earned [and] pension amounts attributable to the periods prior to or subsequent to the marriage are separate property while those rights earned during a marriage are proportionally distributable to the parties."); *N.P. v. J.L.P.*, 2008 WL 1952968, at *4-5 (Del. Fam. Mar. 11, 2008) (pro rata portion of retention bonus received after marriage was marital property because interest was acquired during marriage); *Dowd v. Dowd*, 1992 WL 69317, at *8 (Del. Fam. Feb. 25, 1992) (year-end bonus paid in January of following year is marital property because based on work performed in the prior year).

Husband's employment agreement states: "We do not pay monthly draws in January of each year, but during January . . . you will receive *the balance of your prior year's base compensation* . . . in excess of previously received draws."[11] This payment scheme is consistent with the firm's partnership agreement, which also provides that the January payment is "earned" the preceding year.[12] Where the terms of a contract are clear on their face, there is no need to resort to extrinsic evidence to aid in interpretation.[13] Both the employment agreement and the partnership agreement plainly state that the January payment represents the balance of Husband's base compensation from the preceding year and is earned in the preceding year.

---

[11] App. to Opening Br. at 255 (Emp't Agreement) (emphasis added); *see also id.* ("The final distribution for each year is on or about January 13 of the following year and includes a distribution of all remaining net income not previously distributed . . . .").

[12] *Id.* at 267 (P'ship Agreement) ("After the close of each fiscal year, any excess of each Partner's share of the Net Income for such fiscal year over his or her Draws and other charges to his or her capital account during or in respect to such fiscal year . . . shall be paid to such Partners as soon as practicable after the end of such fiscal year . . . ."); *see also* App. to Answering Br. at 88 (Husband's 2012 Fin. Info. Memo) ("The aggregate of your 2012 gross distributions is $[x], which is comprised of[, among other sums,] today's gross distribution of $[y]."). . Husband points to the third party beneficiary disclaimer in the Partnership Agreement, and argues that the Partnership Agreement should not be considered when interpreting the Employment Agreement. His argument, however, ignores the Partnership Agreement language where the two documents were intended to be read together. *See id.* at 254 (Emp't Agreement) ("Compensation: *In accordance with and subject to our Partnership Agreement* . . . .) (emphasis added). Further, a third party beneficiary is "an individual who is not a party to a contract [but] can nevertheless enforce it under certain circumstances." 13 WILLISTON ON CONTRACTS § 37:1 (4th ed.). Wife is not seeking to enforce the Partnership Agreement. Instead she is using the agreement as an interpretive aid, as contemplated by the language in the agreement.

[13] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

Husband argues that this interpretation ignores other language in the employment agreement, where Husband and his new law firm agreed as follows for the January 2012 payment:

> As a result of your admission to the Firm in 2011, a significant portion of the revenue from clients generated by you and/or your work during the balance of 2011 will necessarily fall into 2012, and accordingly, all of the amount paid to you in 2012 constituting the balance of your 2011 base compensation and/or constituting a bonus (if any) payable respecting your 2011 performance, will be treated by the Firm and you as 2012 income for all financial and tax reporting purposes.[14]

According to Husband, even though the foregoing language addressed the January 2012 payment, it supports his interpretation that the January 2013 payment was in anticipation of revenues the firm would receive in 2013, and therefore when his income is matched with the tax year, the $2.7 million January 2013 payment is not marital property.[15]  This argument fails for several reasons.  As Husband admitted at trial, if he left the firm on February 1, 2013 after receiving his January payment, the January payment would have been "earned" and owed to him regardless of his

---

[14] App. to Opening Br. at 256 (Emp. Agreement).

[15] Husband relies on the principle of contract construction that "[s]pecific language . . . controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."  *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).  According to Husband, applying this principle demands that the provision treating the January payment as income for the year it is received "for all financial and tax reporting purposes" be interpreted to negate the prior language in the employment agreement making clear the January payment is for the previous year's compensation.  But these provisions are not in conflict.  The first explains *what the January payment is*—the balance of last year's compensation—and the second explains *how it will be treated* for accounting purposes—this year's income.  The provisions address different issues and are not in conflict.

departure.[16] Further, although Husband concentrates on the tax treatment of the payment, the employment agreement language relied on by Husband reinforces Wife's position that the payment was "earned" the year before. For Husband's January 2012 payment, the provision relied on by Husband states that "all of the amount paid to you in 2012 constituting *the balance of your 2011 base compensation* and/or constituting a bonus (if any) payable *respecting your 2011 performance* . . . ."[17] This language is consistent with Wife's position, where the January payment is "earned" in the year preceding the payment.

Husband's argument is at odds with the express language of his employment agreement and the partnership agreement. Husband's position merely reflects the special tax treatment of the January payment agreed to by Husband and his law firm, rather than controlling when the payment was earned for marital property purposes. The Family Court correctly decided that Husband's January 2013 payment was earned in 2012 and therefore partially includable in the marital estate.

**B. The Allocation Of Marital Property**

Husband argues that the Family Court improperly weighed the relevant statutory factors when it awarded Wife 65% of the non-retirement assets and 50%

---

[16] App. to Opening Br. at 737 (Hr'g Tr., Jan. 17, 2014):
> The Court: If you drop dead on the 14th of any given year and they've already given you whatever amount of money that they have given you, how do they get their money back?
> [Husband]: They don't.

[17] App. to Opening Br. at 256 (Emp't Agreement) (emphasis added).

9

of the retirement assets. Under 13 *Del. C.* § 1513(a), the Family Court is required to consider a list of at least eleven factors as it deems just when exercising its broad discretion to divide marital property in an equitable manner.[18] This Court will not disturb the Family Court's consideration of these factors and the resulting division of marital property unless it abused its discretion.[19]

The Family Court painstakingly weighed the evidence and concluded, based on the factors set forth in § 1513, that Wife was entitled to a larger share of the marital estate than Husband. The court's determination rested heavily on Husband's ability to earn annually fifty times what Wife might earn, as well as the fact that both parties had contributed equally, though in different ways, to the marriage.[20] The weighing of the various factors is uniquely within the province of the Family Court, and after reviewing the court's analysis, it is clear that it did not abuse its discretion or fail to support its reasons for the final division percentages.

### C. Wife's Dependency And The Alimony Award

Husband next argues that the Family Court erred by not considering the substantial assets allocated to Wife when determining dependency. According to

---

[18] *Gately v. Gately*, 832 A.2d 1251 (Del. 2003) (Table); *Linder v. Linder*, 496 A.2d 1028, 1030 (Del. 1985); *see also Olsen v. Olsen*, 971 A.2d 170, 178 (Del. 2009) ("[The Family Court] is not required to place equal weight on each factor, it is simply required to analyze and balance the factors in reaching a conclusion as to the division of property between the spouses.").

[19] *Wife (L. R.) v. Husband (N. G.)*, 412 A.2d 333, 334 (Del. 1980) ("If there was no abuse of discretion, we must affirm even if we would have reached different conclusions had we been the trier of fact.").

[20] Opinion I at 31-36.

Husband, the Family Court allocated to Wife substantial marital assets, and Wife should be required to exhaust those assets before being eligible for alimony. Wife states in response that the Family Court considered the marital assets allocated to Wife when it reduced her alimony award based on the income those assets might produce, and properly determined that Wife was dependent based on the couple's standard of living during the marriage.

Under the alimony statute, 13 *Del. C.* § 1512, the Family Court must consider "all relevant factors," including the enumerated statutory factors, when determining dependency and calculating alimony if dependency is found. The dependency determination and alimony award are relative, and based on the standard of living established during the marriage.[21] As one of the factors, the Family Court must consider the assets allocated to a spouse in the property division.[22] "The Family Court's rulings 'will not be disturbed on appeal if: (1) its findings of fact are supported by the record; (2) its decision reflects due consideration of the statutory factors found in section 1512; and (3) its explanations, deductions and inferences are the product of a logical and deductive reasoning process.'"[23]

---

[21] *Id.* at 1145-46.

[22] 13 *Del. C.* § 1512(b)(2); § 1512 (c)(1). Assets can be allocated in the property division in lieu of alimony. 13 *Del. C.* § 1513(a)(4).

[23] *Thomas v. Thomas*, 102 A.3d 1138, 1142 (Del. 2014) (citing *Gray v. Gray*, 503 A.2d 198, 201 (Del. 1986)).

11

Where the Family Court finds a deficit exists between spouses based on the couple's standard of living during the marriage, and the supporting spouse has the financial resources to pay alimony, as a general rule the dependent spouse is not required to liquidate marital assets allocated in the property division before qualifying as dependent.[24] This rule reflects the equitable nature of both property division and alimony awards, and the support obligations that marriage creates. It would in many cases be unfair for the less pecunious spouse to have to liquidate marital assets while the supporting spouse keeps his or her allocated marital assets and maintains the marital standard of living. If the supporting spouse has the ability to pay alimony, the dependent spouse should be able to maintain the same

[24] 27B C.J.S. *Divorce* § 621 (2015); Marian F. Dobbs, Determining Child & Spousal Support § 3:64 (2015); *see, e.g.*, *In re Marriage of Drury*, 740 N.E.2d 365, 369 (Ill. Ct. App. 2000) ("A spouse seeking maintenance should not be required to sell assets or impair capital to maintain herself in a manner commensurate with the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet both his needs and the needs of his former spouse."); *Wright v. Wright*, 135 So. 3d 1142, 1145 (Fla. Dist. Ct. App. 2014) ("In determining the need for alimony, the trial court should be mindful that the former wife is not required to liquidate and deplete her assets to provide for her living expenses."); *Ashlock v. Ashlock*, 154 S.W.3d 419, 421 (Mo. Ct. App. 2004) ("[A] person seeking maintenance is not required to consume or deplete his or her marital property to meet his or her expenses before being entitled to maintenance."); In re *Marriage of Bounds*, 60 P.3d 1090, 1093 (Or. App. 2003) (affirming an award of spousal support despite the fact that dependent spouse received a lump-sum cash award of $400,000 and allegedly would be able to earn investment income from the award); *Perrine v. Christine*, 833 S.W.2d 825, 827 (Ky. 1992) ("The circuit court order does not require Patricia to liquidate, it merely concludes—and reasonably so—that she possesses sufficient property to provide for her reasonable needs and to continue the standard of living established during her marriage, all while maintaining an undisturbed investment principal of $533,000."); In re *Marriage of Kerber*, 574 N.E.2d 830, 832 (Ill. App. 1991) ("A spouse need not be reduced to poverty before maintenance is appropriate. Further, a spouse is not required to sell off his or her assets or capital in order to maintain the standard of living established during the marriage."); In re *Marriage of Smith*, 471 N.E.2d 1008, 1017 (Ill. App. 1984) ("Even where a spouse is awarded sufficient marital property to pay her own fees, the other spouse can be ordered to pay them so that she is not required to deplete her capital assets.").

standard of living enjoyed during the marriage without liquidating marital assets.[25]

The Family Court has previously followed this rule.[26]

In this case the Family Court considered the marital assets awarded to Wife, the couple's standard of living during the marriage, Wife's relative economic disadvantage following the divorce, and Husband's stipulation that he could afford to pay alimony. The court properly exercised its discretion and did not require Wife to exhaust those assets before qualifying as dependent.

Husband argues that our decision in *Thomas v. Thomas*[27] requires that Wife exhaust the substantial marital assets allocated to her in the divorce before she can be considered dependent. In *Thomas*, the husband earned approximately $60,000 per year, and would be "barely able to cover his own expenses" if required to pay alimony, despite the wife having $629,000 in assets after accounting for a separate

---

[25] *See Thomas*, 102 A.3d at 1145-46 ("The meaning of dependency must be 'measured against the standard of living established by the parties during their marriage.'") (quoting *Gregory J. M. v. Carolyn A. M.*, 442 A.2d 1373, 1375 (Del. 1982)); *Kelly v. Kelly*, 925 So. 2d 364, 368 (Fla. Dist. Ct. App. 2006) ("A spouse of a relatively long-term marriage is entitled to maintain the style or standard of living enjoyed during marriage if possible. And a spouse is not required to deplete her capital assets to maintain the standard of living she enjoyed during the marriage."); *De Cenzo v. De Cenzo*, 433 So. 2d 1316, 1318 (Fla. Dist. Ct. App. 1983) ("[P]ermanent periodic alimony is used to provide the needs and the necessities of life to a former spouse as they have been established by the marriage of the parties. The two primary elements to be considered when determining permanent periodic alimony are the needs of one spouse for the funds and the ability of the other spouse to provide the necessary funds.").

[26] *See, e.g.*, *G.W.S. v. J.M.G.*, 2000 WL 1658414, at *4 (Del. Fam. Ct. July 20, 2000) (Wife not required to deplete investments to meet recurring monthly expenses when Husband "can well afford to meet his needs and assist Wife with hers.").

[27] *Thomas*, 102 A.3d at 1148.

inheritance.[28] The Family Court found that Wife was dependent, and excluded the approximately $500,000 inheritance from its dependency determination.[29] On appeal we recognized that while an inheritance is excluded from marital property for purposes of property division under § 1513,[30] this exclusion did not apply to alimony awards under § 1512. We reversed, and found that the Family Court erred by not considering the wife's inheritance when determining dependency.[31]

Our decision in *Thomas* is not controlling in this case. In *Thomas*, the spouse seeking support had independent resources adequate to maintain her lifestyle, while the husband would barely be able to cover his expenses. Here, Wife did not have independent financial resources. Her assets following divorce came from the division of shared marital assets, which neither party would have to liquidate to maintain their affluent lifestyle during marriage. Husband also stipulated that he could afford alimony.[32] The Family Court found that Husband will be able to maintain a comfortable lifestyle and high income, and maintain the assets allocated to him in the divorce. The Family Court also determined that, given the couple's wealthy standard of living before divorce, and Wife's relatively

---

[28] *Id.*

[29] *Id.* at 1145-48.

[30] 13 *Del. C.* § 1513(b)(1).

[31] *Thomas*, 102 A.3d at 1147-48.

[32] App. to Answering Br. at 15 (Husband's Resp. to Mot. to Compel) ("[Husband] is not contesting his ability to pay . . . reasonable alimony should the Court find that [Wife] is eligible for the same.").

14

limited earning capacity after divorce, Wife was at a significant economic deficit compared to Husband.[33]

The Family Court applied the required statutory factors before determining dependency, awarding alimony, and fixing the amount. The court did not abuse its discretion when it found Wife dependent and awarded Wife alimony without requiring her to exhaust assets allocated to her in the property division.

### D. Excluding The New Home Cost From Wife's Investment Assets

Husband argues that the Family Court erred by subtracting the cost to buy a new home from Wife's assets when it determined which assets Wife could expect to derive income from, and thus how much investment income she could expect to earn when calculating alimony. The parties argue over whether this was equitable. The Family Court has the discretion to formulate an alimony award considering all of the relevant factors, provided it follows a logical deductive process.[34] The court decided to make this allowance after reasoned consideration of the parties' relative resources and needs, and therefore did not abuse its discretion.

---

[33] Wife testified to expenses not covered by alimony including legal fees, college expenses for the children, and out-of-pocket costs for medical care for one of the children. App. to Answering Br. at 173-77, 179, 195-98 (Hr'g Tr., Apr. 16, 2014). The court found that "based upon the parties' affluent standard of living, the Court finds the case herein is distinguishable from *Thomas* and Wife does not have sufficient funds to meet her reasonable monthly expenses and is dependent upon Husband for support." Opinion II at 12.

[34] *Thomas*, 102 A.3d at 1142 ("The Family Court's rulings will not be disturbed on appeal if . . . its explanations, deductions and inferences are the product of a logical and deductive reasoning process.").

**E. The Rate Of Return On Wife's Investment Assets**

Husband also argues that the Family Court erred as a matter of law when it found, based on expert testimony, that Wife could reasonably expect a 4.5% annual rate of return from her investment assets. The rate of return affected how much income the court attributed to Wife, and thus affected her alimony. Husband claims that the Family Court arrived at 4.5% by selecting the mid-point between Husband's expert's projected rate of investment return and Wife's expert's projected safe withdrawal rate. The withdrawal rate is the rate at which Wife could withdraw assets from her investment portfolio without the risk of depleting her principal. Husband argues that the two rates reflect distinct concepts, and the Family Court erred by taking an average of the two percentages.

The Family Court "use[d] the middle point of [the experts'] projections."[35] It is not entirely clear how the "middle point" was chosen, but the court appreciated the distinction between rates of return and withdrawal rates. The Family Court recognized that the experts' "respective analysis was [sic] quite different."[36] When the court discussed rates of return, it clearly identified them as

---

[35] Opinion I at 29-30.
[36] *Id.* at 29.

16

such and discussed what they were.[37]  When it discussed withdrawal rates, it did the same.[38]

Husband's expert testified that Wife could expect a cumulative rate of return on her assets of between 6 and 8% per year, and even possibly 10 to 12%.[39] Wife's expert was unwilling to state with the same level of certainty what Wife could reasonably expect to earn,[40] but Wife's expert provided projected rates of return for certain specific investments that she would recommend for Wife.  These varied, though they were all lower than Husband's projected cumulative rate.[41] Husband's expert calculated an average of Wife's expert's projected rates, and

---

[37] *Id.* at 23 ("[Husband's expert] testified that he believed Wife could earn at minimum a [6%] *rate of return on her investments*.") (emphasis added); *id.* at 26-27 ("[Wife's expert's] analysis provided that one and three year *return* on the Ultra Conservative Growth and Income strategy was 4.13% and 4.19%.  The benchmark *yield on the portfolio* was 1.82% and the risk based *return for the strategy* since its inception in 2009 was 7.29%.  A management fee for the strategy would generally be 1.0%.  [Wife's expert] also included an analysis of the Intermediate Fixed Income Strategy to indicate how the 70% of the assets invested in fixed income securities in the Ultra Conservative Growth and Income Strategy could be expected to perform.  The benchmark for *returns for 1 and 3 years* was .086% and 2.91% respectively and the *annualized five year return* is 3.96%.") (emphasis added); *id.* at 28 ("[Husband's expert] interprets [Wife's expert's] report to suggest an annualized *rate of return* of approximately 4.311% and a sustainable *withdrawal rate* of 2.8% annually.") (emphasis added).
[38] *Id.* at 27 ("[Wife's expert] *also* testified as to the *rate Wife could safely withdraw from her investments each year* while continuing to retain enough principal to grow her assets.") (emphasis added).
[39] App. to Opening Br. at 670 (Husband's Expert Report).
[40] App. to Answering Br. at 124 (Hr'g Tr., Apr. 16, 2014).
[41] For example, Wife's expert noted a .086% return benchmark after one year for her Intermediate Fixed Income Strategy to a 4.19 % annual return for her Ultra Conservative Growth & Income Strategy after three years.  App. to Opening Br. at 675 (Wife's Expert Report).

arrived at an annualized aggregate return of 4.3%.[42] The experts also seemed to agree that 2.8% per year was a reasonable safe withdrawal rate.[43]

The rate of return is a factual determination which this Court will not disturb unless it is clearly wrong or otherwise demonstrates that the Family Court abused its discretion.[44] In this case, the Family Court used a 4.5% annual rate of return on investment. This rate was well within the experts' range, from negligible returns predicted by Wife's expert for certain investments, to Husband's expert's 4.3% aggregate rate of return derived from Wife's expert's projections, to Husband's expert's own projections of at least a 6% and up to (an improbable) 12% rate of return. The court's number was thus not clearly wrong and supported by the ranges predicted by the experts.

Husband also argues that the court erred in selecting a 4.5% rate of return because the couple had been earning between 5% and 6% rates of return on certain riskier Wells Fargo investments before their divorce, and should have used those in its alimony calculation. But Wife no longer has the security of Husband's income, and so is likely to be more risk averse than she was during their marriage.[45] As a result, the court did not abuse its discretion in refusing to consider higher-yielding but riskier investments.

---

[42] *Id.* at 826 (Hr'g Tr., Apr. 15, 2014).
[43] Opinion I at 28.
[44] *Roberts v. Roberts*, 19 A.3d 277, 280 (Del. 2011).
[45] Opinion I at 24-25 ("[W]omen in Wife's situation [are] generally very risk [averse] . . . .").

18

**F. The Insurance Policies**

Husband argues the court erred by requiring him to maintain certain life insurance policies, originated during the marriage, with Wife as beneficiary. He claims that the court did not give sufficient consideration to the present value of Wife's alimony award or tax consequences when it reasoned that these policies were meant to be guarantees for the alimony award. The relevant statute, 13 *Del. C.* § 1512(e), expressly authorizes the Family Court to "direct the continued maintenance and beneficiary designations of existing policies insuring the life of either party." This Court has sustained other orders to maintain insurance policies as security for alimony awards.[46] Requiring the maintenance of life insurance policies was within the court's discretion.

**G. Attorney's Fees**

In the "Nature and Stage of Proceedings" section of her answering brief, Wife requests that this Court award her fees as she believes Husband's appeal was meritless and lodged to harass her. Wife did not file a motion or otherwise argue the claim in her briefing. "Although we have authority under Supreme Court Rule 20(f) to award attorneys' fees in the case of a frivolous appeal, we will not consider an informal request in the absence of a formal motion made and presented

---

[46] *See Norris v. Norris*, 808 A.2d 758, 761 (Del. 2002); *see also Jerry L. C. v. Lucille H. C.*, 448 A.2d 223, 226 (Del. 1982).

19

in accordance with the Supreme Court Rules."[47]  Accordingly, Wife's informal request is denied.

## IV.  CONCLUSION

Because the Family Court committed no legal error and did not abuse its discretion, the judgment of the Family Court is affirmed.

---

[47] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 688 (Del. 2013) (emphasis omitted) (citing *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1222 n.96 (Del. 2012)).