# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RALPH R. GRANT and MARY GRANT,* | § § § | No. 80, 2017 |
| Respondents Below, Appellants, | § § § § | Court Below: |
| v. | § § | Family Court of the State of Delaware, |
| MINDY GRANT and RAYMOND GRANT, | § § § | in and for New Castle County |
| Petitioners Below, Appellees. | § § § | File No. CN15-06398 Petition No. 15-36574 |

Submitted: October 18, 2017
Decided: November 7, 2017

Before **STRINE**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Family Court. **REVERSED**.

David C. Gagne, Esquire (*argued*) and Achille C. Scache, Esquire, (*argued*) Giordano, Delcollo, Werb & Gagne, Wilmington, Delaware for Appellants.

Andrew W. Gonser, Esquire (*argued*), Gonser and Gonser, P.A., Wilmington, Delaware for Appellees.

**VALIHURA**, Justice:

---

* By Order dated February 24, 2017, the Court assigned pseudonyms to the parties pursuant to Del. Supr. Ct. R. 7(d).

The Fourteenth Amendment of the United States Constitution contains "a substantive due process component" that protects "certain fundamental rights and liberty interests."[1] One of these fundamental liberty interests is the liberty interest of parents to make decisions concerning the care, custody, and control of their children.[2] The United States Supreme Court has stated that this interest "is perhaps the oldest of the fundamental liberty interests recognized" by the Court.[3] However, this interest is not absolute. Under certain state statutes, third parties may petition the court for visitation rights. But to protect parents' constitutional liberty interest, courts must grant "special weight" to parents' views on visitation and their children's best interests.[4] Although the Supreme Court has not defined "special weight," precedent "make[s] it clear that 'special weight' is a very strong term signifying extreme deference."[5]

Accordingly, under Delaware's Third Party Visitation statute, 13 *Del. C.* § 2412 ("Section 2412"), when a parent objects to a third party's request for visitation, "the

---

[1] *See e.g., Troxel v. Granville*, 530 U.S. 57, 65 (2000).

[2] *Id*. at 65-66 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)).

[3] *Id.* at 65.

[4] *Id*. at 69-70. In *Troxel*, the Supreme Court considered whether a Washington state statute that allowed any person to petition for child visitation rights at any time unconstitutionally infringed on a parent's fundamental right to make decisions concerning the care, custody, and control of his or her children in violation of the Fourteenth Amendment. *Id*. at 65. The Court found the "breathtakingly broad" Washington statute unconstitutional because "it gave no special weight at all to [the mother's] determination of her daughters' best interests" and instead improperly placed the burden on a fit, custodial mother, to *disprove* that visitation would be in the best interest of the children. *Id*. at 67, 69. The *Troxel* decision thus requires that, to comply with the Constitution, third-party visitation statutes must accord "special weight" to a fit parent's decision about what is in the best interest of his or her child. *Id*. at 69, 70.

[5] *C.M.G. v. L.M.S*., 2009 WL 5697870, at *8 (Del. Fam. Ct. Dec. 21, 2009) (quoting *Oliver v. Feldner*, 776 N.E.2d 499 (Ohio Ct. App. 2002) (citations omitted)).

parent's determination of the child's best interest will prevail unless the nonparent seeking visitation proves that: (1) visitation is in the child's best interest; (2) the parent's objections are unreasonable by clear and convincing evidence; and (3) visitation will not substantially interfere with the parent-child relationship by a preponderance of the evidence."[6]

Here, in the case before us, grandparents petitioned for third-party visitation rights, and the parents objected. The Family Court essentially found the parents' objections were not unreasonable. The grandparents had attacked the parents on social media, disparaged their parenting abilities, demoralized their son (the father), and sought to meddle in the parents' relationships with their children. Nonetheless, the court awarded the grandparents the right to visitation in a "supervised, therapeutic setting."[7] The court believed that visitation in such a controlled environment, and under the supervision of a trained professional, would minimize the parents' concerns and render their objections "clearly unreasonable."[8]

However, the record provides no basis for supporting the conclusion that supervised, therapeutic visitation would adequately address the reasonable objections of the parents. Further, the grandparents here presented no evidence to support a finding that supervised, therapeutic visitation would not substantially interfere with the parent-child relationship.

Thus, for the reasons set forth below, we hold that the Family Court abused its discretion in awarding visitation to the grandparents and accordingly, REVERSE.

---

[6] *Everett v. Scott*, 137 A.3d 971, 2016 WL 2585768, at *4 (Del. Apr. 26, 2016) (TABLE).

[7] Order at 25.

[8] *Id.*

2

## I. Factual Background

Before giving birth to her children, the relationship between Mary Grant ("Mother") with her in-laws "wasn't the warmest," but still amicable.[9] However, while pregnant with her first son, Mother grew concerned about her in-laws' seeming desire to interfere with her role as a parent. For example, Raymond and Mindy Grant ("Grandfather" and "Grandmother" individually, and "Grandparents" collectively) told parents, their son Ralph ("Father") and Mother (collectively, "Parents"), that they intended to serve as their future grandchildren's confidants. They invoked the mantra of "whatever happens at [Grandparents' house] stays [at Grandparents' house]" and said that they would not tell Parents if the children confided in them about drug and alcohol use.[10] After Parents mentioned that they envisioned their firstborn attending daycare, Grandmother insisted she would babysit him instead. Mother felt Grandmother was encroaching on her role as a parent.

Once their first son was born in 2008, Parents began the tradition of weekly family dinners with each set of grandparents. During such dinners, Grandparents ignored Parents and attempted to persuade their young grandchildren ("Children") to push Parents for more time among Grandparents and Children. For example, Grandmother told Children, "Make sure you tell your mommy to bring you over as soon as possible."[11]

Grandparents were never satisfied with just weekly dinners, and Father recalled that

---

[9] *Id.* at 5 (quoting Mother's testimony at A0094).

[10] *Id.* at 6 (quoting Mother's testimony at A0094).

[11] *Id.* at 7 (quoting Father's testimony at A0134).

3

they would yell whenever Parents rebuffed Grandparents' requests to increase their frequency. Grandparents would "lay into" Father in person and by e-mails, text messages, and phone calls alleging that Parents were committing severe child and elder abuse.[12] Grandparents told Father that Mother was brainwashing him and blamed her for the state of family relations. Despite Grandparents' behavior, Parents maintained their tradition of weekly dinners, but they became more difficult logistically after their third child was born in 2012.

The last straw came on May 20, 2013, when Mother had to take one son to the hospital for x-rays, and Mother texted Grandmother that they would need to take a "rain check" on dinner because that one son was sick.[13] Grandmother responded, "We don't deserve this."[14] Though Parents had previously contemplated ceasing contact between Children and Grandparents several times, they finally decided to end all visits.

In the aftermath of Parents' decision, Grandmother joined Facebook groups such as "Narcissist Parents Who Abuse Their Own Children,"[15] "Parents of Estranged or Alienated Adult Children,"[16] "Grandparents Without Rights,"[17] and "Prayers for Broken Families."[18]

---

[12] *Id.* at 6 (quoting Mother's testimony at A0096); *id.* at A0014 (Grandmother admitting to sending nasty e-mails and texts); *id.* at A0053 (Grandmother testifying that she thinks Parents are "committing grandparent alienation" and abusing the Children and Grandparents).

[13] *Id.* at 7 (quoting Mother's testimony at A0098-99).

[14] *Id.* (quoting Mother's testimony at A0098-99).

[15] App. To Appellants' Opening Br. at A0182.

[16] *Id.* at A0174.

[17] *Id.* at A0183.

[18] *Id.* at A0194.

She posted that she wanted to "slap" Mother, Father, and maternal grandparents;[19] that Mother is "narcissistic";[20] and that Grandmother "sent a lot of daggers" towards Mother at one of the Children's sports games.[21] She also wrote, "[S]ome days I want to[] kill everyone. I do take meds for this rage I feel and it helps."[22] Although Grandmother believed that these groups were private, she later learned that anyone could join them. Parents had joined under a pseudonym to monitor Grandmother's posts to protect their family.

Sometimes Father received texts from Grandmother saying that she missed him. But other times she wrote that she hated him and was going to write him out of Grandparents' will. In September 2013, Father went to Grandparents' house to remove some of his belongings, and Grandfather called him a "pussy" and said he should change his last name to Mother's maiden name.[23]

Grandmother admitted that she enjoyed annoying Mother by showing up at Children's games over Parents' objections. Grandparents generally did not approach Children, but they tried to get their attention. Father asked Grandparents to leave one game because they had approached Parents' oldest son and it frightened him. Grandparents

---

[19] *Id*. at A0209; *see also* A0194 ("I'm just so angry today about this mess, I'd like to go to my [Estranged Son's] house and slap both of them.").

[20] *Id*. at A0185, A0190.

[21] *Id*. at A0192.

[22] *Id.* at A0210; *see id.* at A0221 ("I take Cymbalta. But I was taking it before the estrangement. I do have a glass of wine in the evening.").

[23] Order at 8 (quoting Father's testimony at A0131, A0136).

refused and said, "this is on you."[24] Grandparents also attended the oldest son's First Holy Communion uninvited, and Grandmother attempted to volunteer at Children's school to see them before Mother called the school to prevent her.

Mother testified that she could not envision a situation where she would consider visitation acceptable, whether supervised or not.[25] Father echoed Mother: "I couldn't imagine sending my kids to visit people that have openly admitted to disliking the way that we choose to raise our children. I -- I can't see any way, shape, or form how that would not impact our relationship with our kids."[26]

The Family Court found that the "severe wedge" between Parents and Grandparents stemmed from Grandparents' expectations for more time with Children and their "aggressive approach to pushing" for it. Grandparents' wishes conflicted with Parents' desire to "have a more structured schedule for contact and to not permit anyone – Father's parents or Mother's – to have time with the children without either parent present."[27]

However, despite Grandparents' increasingly "inappropriate behaviors," including "unfortunate statements by Grandmother on Facebook," the Family Court also blamed Parents for "rapidly chang[ing their behavior] in a very negative way, going from weekly visits with Grandparents to, without warning, no contact whatsoever, and forbidding Grandparents from attending even sporting events for the boys," and "telling the children

---

[24] *Id*. at 9 (quoting Father's testimony at A0143).

[25] App. to Appellants' Opening Br. at A0118.

[26] *Id*. at A0144-45; *id*. at A0153 (Father verifying at hearing that he could not imagine any scenario where he would consider visitation "safe or appropriate").

[27] Order at 10.

6

that Grandparents are not safe people and that they are in fact people about whom the children should be concerned."[28]

On January 30, 2017, the Family Court granted Grandparents' petition for visitation. It found that, although most of the best interest factors set forth in 13 *Del. C.* § 722 favored neither party, "permitting some level of contact with Grandparents [was] in the best interests of the children."[29] The Family Court indicated that Parents' "complete denial of visitation" was unreasonable in light of arrangements that might alleviate their concerns and awarded "supervised, therapeutic visitation."[30] The court believed such visitation would not substantially interfere with the parent-child relationship,[31] even though the court received no evidence on the subject of supervised visitation. Parents appealed this decision and, on March 24, 2017, the Family Court stayed its decision authorizing supervised visitation.

On appeal, Parents first contend that the Family Court erred in its application of Section 2412's requirement that a third-party seeking visitation must demonstrate that the parents' objections are unreasonable by clear and convincing evidence. Second, they argue that the Family Court also misapplied the statute in granting supervised, therapeutic visitation. Third, they contend that the statute providing for modification of third-party visitation orders, 13 *Del. C.* § 2413, is unconstitutional because it does not accord deference

---

[28] *Id.* at 10-11.

[29] *Id.* at 18.

[30] *Id.* at 34-35.

[31] *Id.* at 34.

7

to the parents.  We do not address this last contention as it was not fairly presented below.[32]

## II.        Scope and Standard of Review

We review the Family Court's legal conclusions *de novo*.[33]  However, we "review the Family Court's application of the law to the facts and the sufficiency of evidence supporting its findings for an abuse of discretion."[34]  The Family Court does not abuse its discretion if its findings "are sufficiently supported by the record and are the product of an orderly and logical deductive process[.]"[35]

## III.        Analysis

As mentioned, "where a parent objects to visitation, the parent's determination of the child's best interests will prevail unless the nonparent seeking visitation proves that: (1) visitation is in the child's best interests; (2) the parent's objections are unreasonable by clear and convincing evidence; and (3) visitation will not substantially interfere with the parent-child relationship by a preponderance of the evidence."[36]  The court may grant third-party visitation only if all three statutory requirements are met.[37]  Even accepting the facts as found by the Family Court, the record does not sufficiently support the Family Court's decision to order supervised, therapeutic visitation.  Accordingly, we conclude that the Family Court abused its discretion and reverse.

---

[32] Del. Supr. Ct. R. 8.

[33] *Everett*, 2016 WL 2585768, at *2; *Glanden v. Quirk*, 128 A.3d 994, 999 (Del. 2015).

[34] *Taylor v. Forrester*, 903 A.2d 323, 2006 WL 1640319, at *2 (Del. 2006) (TABLE).

[35] *Everett*, 2016 WL 2585768, at *2 (citing *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972)).

[36] *Id.* at *4.

[37] *See L.M.M. v. C.M.L.*, 2012 WL 5198326, at *2 (Del. Fam. Ct. July 20, 2012).

A. *Parents' objections were not unreasonable, and Grandparents have not carried their burden to show otherwise.*

In situations where a parent objects, the third-party seeking visitation must show by clear and convincing evidence that the parents' objections to visitation are unreasonable.[38] "The clear and convincing standard requires evidence that 'produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions [is] highly probable.'"[39] The third party -- not the parents -- bears the burden of proof: parents do not bear the burden of proving that their objections are reasonable. We have upheld the Family Court's determination that the parents' objections to visitation were not unreasonable when there was at least some evidence to support the objections.[40] Alternatively, we have affirmed the Family Court's finding that the third party seeking visitation met its burden of proving that parents' objections were unreasonable when there was no evidence supporting the parents' stated reasons for objecting.[41] Here, the record is replete with

---

[38] 13 *Del. C.* § 2412.

[39] *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (quoting *Cerberus Int'l v. Apollo Mgmt.*, 794 A.2d 1141, 1151 (Del. 2002) (internal quotation marks omitted)).

[40] *See Grey v. Knight*, 2014 WL 814068, at *1-2 (Del. Feb. 27, 2014) (affirming Family Court's denial of grandmother's request for unsupervised visitation where there was evidence that the child feared the grandmother and thus parents' objection was not unreasonable); *Frank v. Stewart*, 2013 WL 2304105, at *1 (Del. May 24, 2013) (affirming Family Court's denial of grandmother's petition for unsupervised visitation where there was evidence the grandmother lacked knowledge about her grandchild's many medical problems and thus mother's objection on that basis was not unreasonable); *see also L.M.M. v. C.M.L.*, 2012 WL 5198326, at *6 (denying grandmother's petition for unsupervised visitation as it was not unreasonable for the parents to object to visitation where there was evidence the grandmother had emotionally abused the mother and attempted to turn other family members against the mother, and parents feared that the grandmother would similarly attempt to turn their children against the mother).

[41] *See Everett*, 2016 WL 2585768, at *5 (affirming Family Court's award of visitation where mother objected to grandfather's request for visitation because of his allegedly abusive behavior,

9

evidence supporting Parents' objections to *any* visitation based on their concern that visitation will be harmful to their family unit, not only because of Grandparents' actions but also because of the impact on Parents and Children.

Parents' objections to visitation are supported by evidence that Grandparents sought to serve as Children's confidants and their preemptive refusal to advise Parents if they ever discovered that the Children were using drugs or alcohol; Parents' frustration with Grandparents' repeated and sometimes vicious demands for more time with Children; Grandmother's Facebook comments and Grandfather's name-calling; Grandparents' attendance at various events over Parents' objections or uninvited; and Children's fear of Grandparents.

Indeed, the Family Court acknowledged that Parents' objections were not unreasonable as it observed that "Grandparents' actions in pushing for more time with the children and making negative comments to Father were inappropriate and overstepping . . . ."[42] The court agreed with Parents that, "on some level, [Grandparents' actions] reflect a lack of respect for Mother's and Father's roles as parents"[43] and later conceded that Grandparents were, in fact, "trying to change the behavior of their son and daughter-in-

---

and there was no evidence in the record showing the alleged abusive behavior); *Samuels v. Jowers*, 127 A.3d 1171, 2015 WL 6941590, at *1-2 (Del. 2015) (TABLE) (affirming Family Court's award of visitation where the father's objection to grandmother's request for visitation was merely based on the fact that his young children did not mention their grandmother to their counselor during previous custody proceedings).

[42] Order at 20.

[43] *Id.* at 20.

law."[44] The Family Court also believed that Grandmother's "inappropriate" Facebook comments "certainly reflect[ed] negativity and anger toward Parents"[45] and that "children are likely fearful of Grandparents at this point . . . ."[46]

Significantly, the court wrote that, "given the negative past comments from Grandparents and the increased discord caused by over three years of estrangement, the Court cannot find Parents' concerns that Grandparents would act in ways that undermine them as parents to be clearly unreasonable."[47] However, the Family Court believed that Parents' objections to visitation would be unreasonable if the visitation were to "take place in a supervised, therapeutic setting" where a professional would "assist in reintroducing the children to Grandparents in a way that is safe and that prioritizes the children's emotional needs."[48] In such a setting, the Family Court believed the professional could monitor "anything negative or unhealthy" and interfere where necessary.[49]

There is no evidentiary basis in the record to support the Family Court's belief that Parents' objections would be "clearly unreasonable" in the context of this sort of visitation. Rather, the Family Court erred by ordering supervised visitation as a middle ground when the evidence overwhelmingly suggests that Parents' objections to visitation were not unreasonable and where Grandparents failed to introduce any evidence as to the potential

---

[44] *Id*. at 24.

[45] *Id*. at 21.

[46] *Id*. at 24.

[47] *Id*. at 25.

[48] *Id.*

[49] *Id.*

mitigating effects of supervised visitation. Thus, we conclude that Grandparents have not met their burden and that Parents' reasons for objecting to any visitation are not unreasonable. We could reverse on this basis alone, but we discuss Grandparents' failure to satisfy the third statutory requirement as well.

> B. *Grandparents did not prove that visitation would not substantially interfere with Parents' relationship with their children.*

To obtain visitation, Grandparents also had to satisfy the court by a preponderance of evidence that visitation would not substantially interfere with the parent-child relationship. The record evidence does not support such a finding. Indeed, the Family Court's findings suggest the opposite, namely, that unsupervised visitation *would interfere* with the parent-child relationship. The court, for example, "agreed with Parents' concerns regarding the impact of comments that may negatively influence the parent/child relationship . . . ."[50] The Family Court also agreed that Parents had reason to be "concern[ed] that Grandparents would act in ways that undermine them as parents . . . ."[51] Yet the Family Court still concluded that visitation would not substantially interfere with the parent-child relationship "if done in a supervised, therapeutic setting . . . ."[52]

But the Family Court's proposed visitation arrangement that depends upon the existence of a supervisor and/or a therapist to, as the Family Court put it, "monitor what is

---

[50] *Id*. at 28-29.

[51] *Id.* at 25.

[52] *Id*. at 28.

12

said such that, if there were anything negative or unhealthy, they could address it . . . ,"[53] itself reflects a serious concern about interference with the parent-child relationship. Indeed, Parents' legitimate concern is further highlighted in the Family Court's explicit finding that "given the negative past comments from Grandparents and the increased discord cause by over three years of estrangement, the Court cannot find Parents' concerns that Grandparents would act in ways that undermine them as parents to be clearly unreasonable."[54] Having reviewed this record, we cannot conclude that having someone in the room to referee Grandparents' actions and proclivity for engaging in inappropriate behavior would adequately address Parents' reasonable concerns about interference with their parent-child relationships.

## IV.    Conclusion

Given that Grandparents did not meet their burden of proof to obtain visitation rights under Section 2412, the Family Court erred in awarding them supervised, therapeutic visitation. We decline to remand as we do not wish to put the parties through further proceedings. Instead, the judgment of the Family Court is REVERSED and Grandparents' petition is denied.

---

[53] *Id*. at 25.

[54] *Id.*

13